# 26-605

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

SHAUN GRAY, an individual,

*Plaintiff-Counter-Defendant-Appellant*,

v.

PARAMOUNT GLOBAL, a Delaware corporation; PARAMOUNT PICTURES CORPORATION, a Delaware corporation; PARAMOUNT STREAMING SERVICES INC., a Delaware corporation,

*Defendants-Counter-Claimants-Appellees*,

DOES 1 THROUGH 10, inclusive,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Southern District of New York – No. 1:25-CV-03484-JSR

## APPELLANT'S OPENING BRIEF & SPECIAL APPENDIX

Marc Toberoff
*mtoberoff@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
(310) 246-3333

*Attorneys for Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant Shaun Gray states that he is an individual.

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

JURISDICTIONAL STATEMENT ......................................................................4

STATEMENT OF THE ISSUES ...........................................................................5

STATEMENT OF THE CASE ...............................................................................6

A.    Factual Background .................................................................................6

        1.    *Top Gun, Eric Singer, Joseph Kosinski, and Shaun Gray* ....................6

        2.    *Gray's contributions to the authorized screenplay development* .........7

        3.    *Maverick's release, prompting Gray's demand* ................................12

B.    Procedural History ...............................................................................14

SUMMARY OF ARGUMENT ..............................................................................16

STANDARD OF REVIEW ....................................................................................19

ARGUMENT ..........................................................................................................20

I.    THE WHOLESALE INVALIDATION OF GRAY'S COPYRIGHT CONTRAVENES THE STATUTE'S TEXT, ITS HISTORY, AND THIS COURT'S PRECEDENT, AS SECTION 103 CONFINES ANY FORFEITURE TO THE PARTS OF A WORK WHICH USED PREEXISTING MATERIAL UNLAWFULLY .........................................20

    A.    Section 103's Text and History Confine Forfeiture to the Unlawfully Used Parts of a Work and Reserve the Author's Own Contribution to the Author ........................................22

    B.    This Court's Decisions Command Separation, Not Forfeiture..........24

    C.    The District Court's Rationale Inverts the Statute and Stretches *Anderson* And *Wozniak* Far Beyond Their Holdings ........................27

D.     On This Record, Wholesale Forfeiture Was Impossible as a Matter of Law, and, at Minimum, Separability Was a Question for the Jury ...................................................................30

II.     THE DISTRICT COURT ERRED IN INVALIDATING GRAY'S COPYRIGHT ON SUMMARY JUDGMENT, BECAUSE THE RECORD RAISES TRIABLE DISPUTES OVER WHETHER GRAY'S USE WAS AUTHORIZED...........................................36

A.     Whether Singer and Kosinski Were Paramount's Agents or Had Actual or Apparent Authority to Involve Gray in Their Screenplay Development Process Had to Be Resolved in Gray's Favor on Summary Judgment and Was Triable ................................37

B.     A Reasonable Jury Could Also Find That Gray's Use of *Top Gun* Material Was Permitted by Implied License .............................47

III.     THE DISTRICT COURT ERRED IN DISMISSING GRAY'S JOINT AUTHORSHIP AND ACCOUNTING CLAIMS WITH PREJUDICE ON THE PLEADINGS...........................................49

A.     The Court Accepted Gray's Independently Copyrightable Contributions, So Dismissal Turned Entirely on Mutual Intent .........50

B.     Mutual Intent Is a Fact-Intensive, Contextual Inquiry, Ill-Suited for Resolution on a Rule 12(B)(6) Motion .........................................51

C.     The Court Resolved Disputed Indicia Against Gray and Demanded Proof the Pleadings Need Not Supply ...........................53

D.     Dismissal With Prejudice and Denial of a First Chance to Amend Were Error .........................................................................57

CONCLUSION ...............................................................................58

CERTIFICATE OF COMPLIANCE ..................................................60

CERTIFICATE OF SERVICE...........................................................60

# TABLE OF AUTHORITIES

***Cases***

*16 Casa Duse, LLC v. Merkin*,
  791 F.3d 247 (2d Cir. 2015)......................................................*passim*

*Alfred Bell & Co. v. Catalda Fine Arts, Inc.*,
  191 F.2d 99 (2d Cir. 1951)..................................................................33

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).........................................................20, 31, 49

*Anderson v. Stallone*, No. 87-CV-0592, 1989 WL 206431
  (C.D. Cal. Apr. 25, 1989).................................................................28, 36

*Asset Mktg. Sys., Inc. v. Gagnon*,
  542 F.3d 748 (9th Cir. 2008).............................................................48

*Atticus Ltd. Liab. Co. v. Dramatic Publ'g Co.*,
  145 F.4th 257 (2d Cir. 2025).............................................................24

*Aymes v. Bonelli*,
  980 F.2d 857 (2d Cir. 1992)..............................................................20

*Beard v. Helman*,
  722 F. Supp. 3d 521 (M.D. Pa. 2024) ..............................................54

*Boisson v. Banian, Ltd.*,
  273 F.3d 262 (2d Cir. 2001)..............................................................31

*Cabrera v. Jakabovitz*,
  24 F.3d 372 (2d Cir. 1994)................................................................43

*Caffey v. Cook*,
  409 F. Supp. 2d 484 (S.D.N.Y. 2006)..............................................29

*Childress v. Taylor*,
  945 F.2d 500 (2d Cir. 1991).................................................*passim*

*Cleveland v. Caplaw Enterprises*,
  448 F.3d 518 (2d Cir. 2006)..................................................18, 39, 56

*Community for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989) ...................................................................................23

*Davis v. Blige*,
    505 F.3d 90 (2d Cir. 2007) ........................................................................56

*Durham Industries, Inc. v. Tomy Corp.*,
    630 F.2d 905 (2d Cir. 1980) ................................................................24, 35

*Eden Toys, Inc. v. Florelee Undergarment Co.*,
    697 F.2d 27 (2d Cir. 1982) ...........................................................25, 27, 28

*Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*,
    140 F.2d 266 (2d Cir. 1944) ......................................................................54

*Edward J. Minskoff Equities, Inc. v. Am. Express Travel Related Servs. Co.*,
    98 F.3d 703 (2d Cir. 1996) ..................................................................44, 46

*Feist Publications, Inc. v. Rural Telephone Service Co.*,
    499 U.S. 340 (1991) .............................................................................23, 33

*First Fidelity Bank, N.A. v. Government of Antigua & Barbuda*,
    877 F.2d 189 (2d Cir. 1989) ................................................................45, 46

*Foad Consulting Grp., Inc. v. Azzalino*,
    270 F.3d 821 (9th Cir. 2001) .....................................................................48

*Fonar Corp. v. Domenick*,
    105 F.3d 99 (2d Cir. 1997) ........................................................................31

*Gilliam v. American Broadcasting Cos.*,
    538 F.2d 14 (2d Cir. 1976) ........................................................................48

*G. Ricordi & Co. v. Paramount Pictures, Inc.*,
    189 F.2d 469 (2d Cir. 1951) ......................................................................24

*Graham v. James*,
    144 F.3d 229 (2d Cir. 1998) ......................................................................47

*Green Door Realty Corp. v. TIG Insurance Co.*,
    329 F.3d 282 (2d Cir. 2003) ......................................................................44

*Hallock v. State*,
64 N.Y.2d 224 (1984) ........................................................................43

*Hedeman v. Fairbanks, Morse & Co.*,
286 N.Y. 240 (1941) .........................................................................44

*Herbert Constr. Co. v. Continental Ins. Co.*,
931 F.2d 989 (2d Cir. 1991).............................................................46

*Hiller, LLC v. Success Grp. Int'l Learning All., LLC*,
976 F.3d 620 (6th Cir. 2020)...........................................................30

*Horror Inc. v. Miller*,
15 F.4th 232 (2d Cir. 2021)..............................................................38

*JBJ Fabrics, Inc. v. Brylane, Inc.*,
714 F. Supp. 107 (S.D.N.Y. 1989)..............................................25, 29

*Kaplan v. Vincent*,
937 F. Supp. 307 (S.D.N.Y. 1996)...................................................55

*Keeling v. Hars*,
809 F.3d 43 (2d Cir. 2015)...............................................................25

*Keeling v. New Rock Theater Prods., LLC*,
2011 WL 1899762 (S.D.N.Y. May 17, 2011)...................................22

*Kirschner v. KPMG LLP*,
15 N.Y.3d 446 (2010) .................................................................39, 40

*L.B. Foster Co. v. America Piles, Inc.*,
138 F.3d 81 (2d Cir. 1998)...............................................................4

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*,
797 F.3d 160 (2d Cir. 2015)........................................................57, 58

*Lynch v. City of New York*,
952 F.3d 67 (2d Cir. 2020)..................................................19, 50, 52

*Maurillo v. Park Slope U-Haul*,
194 A.D.2d 142 (2d Dep't 1993)..................................................39, 47

*Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*,
290 F.3d 98 (2d Cir. 2002)..................................................................52

*Morales v. Quintel Entm't, Inc.*,
249 F.3d 115 (2d Cir. 2001)................................................................20

*Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*,
476 F. Supp. 2d 414 (S.D.N.Y. 2007)..................................................44

*New York Times Co. v. Tasini*,
533 U.S. 483 (2001) ...........................................................................23

*Old Republic Ins. Co. v. Hansa World Cargo Serv.*,
51 F. Supp. 2d 457 (S.D.N.Y. 1999)....................................................45

*Poppington, LLC v. Brooks*,
No. 20-CV-8616 (JSR), 2021 WL 3193023, (S.D.N.Y. July 27, 2021) ...........22

*Prop. Advisory Grp., Inc. v. Bevona*,
718 F. Supp. 209 (S.D.N.Y. 1989).................................................45, 46

*Schrock v. Learning Curve International, Inc.*,
586 F.3d 513 (7th Cir. 2009)..............................................................48

*Silverman v. CBS Inc.*,
870 F.2d 40 (2d Cir. 1989)..................................................................25

*Sotomayor v. City of New York*,
713 F.3d 163 (2d Cir. 2013)...........................................................20, 42

*Stewart v. Abend*,
495 U.S. 207 (1990) ......................................................................21, 22

*Thomson v. Larson*,
147 F.3d 195 (2d Cir. 1998)..........................................................passim

*U.S. v. Inc. Vill. of Island Park*,
888 F. Supp. 419 (E.D.N.Y. 1995)......................................................45

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*,
692 F.3d 1009 (9th Cir. 2012)........................................................23, 34

*Vista Food Exchange, Inc. v. Comercial de Alimentos Sanchez*,
    147 F.4th 73 (2d Cir. 2025)......................................................................43

*Weissmann v. Freeman*,
    868 F.2d 1313 (2d Cir. 1989)...........................................................24, 54

*Wight v. BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000).......................................................................26

*Wolf v. Travolta*,
    167 F. Supp. 3d 1077 (C.D. Cal. 2016)...................................................34

*Wozniak v. Warner Bros. Entertainment, Inc.*,
    726 F. Supp. 3d 213 (S.D.N.Y. 2024).....................................27, 28, 36

*Yonay v. Paramount Pictures Corp.*,
    163 F.4th 685 (9th Cir. 2026)....................................................2, 21, 26

### Statutes

17 U.S.C. § 101 ...........................................................................4, 50, 52

17 U.S.C. § 103 .................................................................................passim

17 U.S.C. § 201(a)...................................................................................23, 48

17 U.S.C. § 204(a)...........................................................................................48

17 U.S.C. § 410(c)....................................................................................31, 37

28 U.S.C. § 1291 ..............................................................................................4

28 U.S.C. § 1331 ..............................................................................................4

28 U.S.C. § 1338(a)...........................................................................................4

### Rules

Fed. R. App. P. 4(a)(1)(A) ..............................................................................4

Fed. R. App. P. 32 ..........................................................................................60

Fed. R. Civ. P. 12(b)(6) ................................................................. 18

Fed. R. Civ. P. 15(a)(2) ............................................................ 19, 57

Fed. R. Civ. P. 54(b) ............................................................... passim

2d Cir. Local Rule 32.1 .................................................................. 60

## *Other Authorities*

Restatement (Third) of Agency § 2.02 (2006) .................................... 18, 43

## **INTRODUCTION**

Shaun Gray's time-stamped files and emails squarely demonstrate that he wrote fifteen of *Top Gun: Maverick*'s most iconic scenes ("Gray Scenes"), amounting to approximately 58% of the film's sequences. Gray wrote for the *Top Gun* sequel at the invitation of his cousin, Eric Singer, the film's screenwriter, and its director, Joseph Kosinski, within the sequel development process Paramount authorized them to conduct. Yet despite repeated assurances, Gray was given no credit and paid nothing by Paramount, prompting him to register his scenes with the Copyright Office. When Gray sued to vindicate his copyright, the district court held that his substantial original written material, key to the hit sequel's success, was wholly unprotected by copyright, because, in its view, it was part of an "unauthorized" derivative work of *Top Gun*.

That holding cannot be squared with the statute. Section 103(a) withholds copyright protection from a work built on prior material only "in [the part] in which [the prior] material has been used unlawfully." 17 U.S.C. § 103(a). The question is not whether parts of the Gray Scenes draw on *Top Gun* (any sequel would) but whether Gray's use of any protectable *Top Gun* elements was *unauthorized* and, even if so, whether Gray made independently copyrightable contributions to *Maverick* that did not appear in *Top Gun*. Thus, even if Gray were not free to exploit his scenes, his original contributions remain protected under § 103(b), and did not

1

fall into a copyright black hole, free for Paramount to use without license or payment. In determining these disputed factual issues, the court credited everything in *Top Gun* with no filtering or analysis of what allegedly borrowed elements were copyright-protectable—ignoring Paramount's inconsistent litigation position in *Yonay v. Paramount Pictures Corp.*, 163 F.4th 685 (9th Cir. 2026), that most of the factual elements comprising the Navy's actual "Top Gun" academy are in the public domain.

On all those decisive questions the district court failed to resolve all, or indeed nearly any, inferences in Gray's favor. On summary judgment, it held that Gray's use of *Top Gun* at the express invitation of Paramount's director and writer, whose contracts authorized them to collaborate with others in developing *Maverick*'s screenplay, was unauthorized *as a matter of law*, rather than construe the evidence of their active collaboration with Gray in the light most favorable to him. It held all this despite the knowledge of Paramount's agents that Gray, *at their behest*, engaged in their story meetings and wrote scenes for *their Top Gun sequel*. The district court likewise ignored Gray's substantial independent creative contributions to *Maverick*, squarely protected under § 103(b).

Whether Gray was engaged in authorized screenplay development is a question of agency and authority: whether the director and screenwriter Paramount empowered to develop *Top Gun*'s sequel were agents of Paramount, or had the actual

2

or apparent authority to involve Gray, or whether their conduct amounted to an implied license for Gray to include *Top Gun* elements. The summary-judgment record permits a reasonable jury to find Gray's use authorized under one of those three pathways and, at minimum, presented genuine issues of disputed fact. On Paramount's motion, all these fact-intensive issues would have had to be resolved in Gray's favor, but the district court did quite the opposite.

The district court's error at summary judgment compounded its earlier error on Paramount's Rule 12(b)(6) motion. While finding that Gray plausibly alleged his independently copyrightable contributions to *Maverick* and its screenplay, it dismissed Gray's *alternative* joint-authorship claim with prejudice (with no chance to amend) by weighing disputed inferences about agency and actual or apparent authority (irrelevant to joint authorship) against Gray.

A single principle thus governs the two rulings before the Court. Each ruling depended on resolving, against Gray as a matter of law, questions the record left genuinely disputed. The lower court's judgment, reached on an unusually compressed schedule, rests on premature fact finding from start to finish. This Court should reverse.

# JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), because Gray's claims arise under the Copyright Act, 17 U.S.C. § 101 *et seq.*

This Court has jurisdiction under 28 U.S.C. § 1291. On February 9, 2026, the district court entered a separate judgment disposing of every claim in Gray's Complaint. A-10531.[1] The court directed entry of that partial final judgment, expressly determining that "the criteria of Rule 54(b) are satisfied here" and that there is "no just reason for delay of judgment and of Plaintiff's contemplated appeal as to the claims asserted in Plaintiff's Complaint." A-10528. Gray filed a timely notice of appeal on March 11, 2026. A-10535-10537.

The Rule 54(b) certification is entitled to "substantial deference." *L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998). Rule 54(b) permits a partial final judgment where multiple claims or parties are present, at least one claim has been finally decided, and the district court expressly determines that there is no just reason for delay. The judgment resolved all three claims in the Complaint, and the court supplied a reasoned, record-based justification for immediate appeal. A-10528; A-10531.

---

[1] As Paramount refused to participate in the preparation of a joint appendix, Gray was forced to include most of the district court filings.

## STATEMENT OF THE ISSUES

1. Whether the district court erred as a matter of statutory construction in invalidating Gray's entire registered copyright, where 17 U.S.C. § 103(a) withholds protection only from the "part[s]" of a work in which preexisting material "has been used unlawfully," and § 103(b) reserves to the derivative author "the material contributed by the author."

2. Whether the district court erred in invalidating Gray's entire registered copyright on summary judgment as an "unauthorized" infringing derivative work under § 103(a), where the court found that (i) Paramount authorized Singer and Kosinski to use *Top Gun* in developing its sequel, and (ii) Singer and Kosinski invited Gray's participation, such that (iii) the statute's "used unlawfully" predicate turned on disputed questions of agency, actual and/or apparent authority, or implied license, each an issue uniquely ill-suited for summary judgment.

3. Whether the district court, after holding that Gray adequately alleged independently copyrightable written contributions, erred in dismissing on the pleadings Gray's joint-authorship and accounting claims with prejudice by resolving the fact-intensive "mutual intent" inquiry against Gray and denying any leave to amend.

5

## STATEMENT OF THE CASE

### A.     Factual Background

#### 1.     *Top Gun, Eric Singer, Joseph Kosinski, and Shaun Gray.*

Paramount released *Top Gun* in 1986 and, decades later, set out to produce a sequel. To write and direct it, Paramount engaged Eric Singer and Joseph Kosinski, respectively, under written agreements. Singer's agreement references his services and results, "either alone or in collaboration with others." A-2951. Kosinski's uses the identical phrase. A-4537. Singer's Certificate of Authorship likewise described him as "writing (or collaborating in the writing of) the Work." A-4530. The district court found, and it is undisputed, that "Paramount authorized Singer and Kosinski to use Paramount's preexisting *Top Gun: Maverick*-related materials, including the original *Top Gun* film, to develop the screenplay." A-10480. Those agreements engaged Singer and Kosinski to develop the *Maverick* screenplay on Paramount's behalf subject to its ultimate control.

Eric Singer is Gray's cousin, and the two had written together for years. Gray testified that just prior to *Maverick* he worked alongside Singer and Kosinski on their film *Only the Brave*, where "Joe and Eric and I worked together . . . more than half the days." A-3929. Then one day, "Joe Kosinski came into Eric's office while I was helping him finish 'Marita,'" Gray recounted, "and we talked out some ideas for a 'Top Gun' sequel"; Kosinski wanted to pitch it to Cruise and told them, "if Tom

6

signs up, I want you guys to write it." A-4045; A-3897. On June 4, 2017, after Cruise signed on, Singer texted Gray: "Got offer on tg -- gonna take it -- wanna bring u on -- u down for cause ?" A-5200. Gray answered: "Hell yes." *Id.* As the district court recounted, "Singer texted Gray and asked him to join in writing the *Top Gun: Maverick* screenplay that would eventually become the 'Singer [D]raft.'" A-10481.

### 2. *Gray's contributions to the authorized screenplay development.*

What followed were over five months of collaborative writing. Drawing on the district court's own recitation of the record: Gray "played a significant role in drafting this screenplay, such as participating in story meetings with Singer and Kosinski and discussing notes received from producers"; "[o]n July 16, 2017, Gray delivered an outline to Singer, based on meetings with Singer and Kosinski." A-10481. In this process, Gray participated in numerous screenplay development meetings with Kosinski and Singer, wrote fifteen key scenes or sequences (the "Gray Scenes") and furnished them to Singer for inclusion in the sequel screenplay and delivery to Paramount. A-10481; A-5212; A-5291; A-5293; A-5052; A-5047. "Singer submitted his final version of the screenplay [including the Gray Scenes] to Paramount on November 3, 2017." A-10481. Gray registered his "Gray Scenes" with the Copyright Office.[2]

---

[2] U.S. Copyright Registration Nos. PAu004227902, PAu004228526, and PAu004228532. A-33; A-3837.

Each of the fifteen Gray Scenes first appears in the evidentiary record as a dated, time-stamped file that Gray created and then emailed to Singer and/or Kosinski after he wrote the sequence, between August and October 2017. A-7427–A-7428; A-7435–A-7438. Those Gray files and the first appearance of the written scenes in the record show Gray originating the scenes, and are objective proof that, in combination with the rest of the record, conclusively show Gray's substantial authorship.

Contemporaneous correspondence confirms that collaboration in the writers' own words, and they show Gray writing at Singer's and Kosinski's request and under their supervision. At the outset, Singer emailed Gray a prior draft sequel screenplay furnished by Paramount, in a file titled "TGII by Justin Marks–J Kosinski," instructing him: "FOR YOUR EYES ONLY…THIS IS WHAT WE HAVE TO WORK FROM." A-5291. Notably, this was one of two scripts for a prior *Top Gun* sequel project which, along with *Top Gun*, itself, was defined as the "Assigned Material" in Paramount's writing contract with Singer. A-4217, A-4239–A-4240, A-4446. The other Paramount script by Peter Craig was furnished to Gray by Kosinski. *Id.*, A-4885.

This collaboration continued throughout the multi-month writing process. On August 21, 2017, hours after Gray emailed Singer the screenplay's opening sequence Gray had written, A-7435, Singer texted back: "Good stuff–cut it all together–sick

opener." A-5208. Singer later acknowledged that the scene was the film's opening, where Maverick takes "th[e] supersonic black jet and . . . breaks the mach . . . speed limit." A-6779.

As the writing proceeded, Singer allocated more scenes for Gray to write. When Gray asked on September 7, 2017, "Is there a scene you want me to start blocking out?", Singer answered, "Lemme think about scene," and "I'll send u what I have." A-5212.

Even the film director's revisions to scenes ran through Gray: Singer forwarded him "joes pass" (Kosinski's tweaks) on October 16, 2017, telling Gray to "check and merge tweaks *u agree with*." A-5052 (emphasis added). Gray responded in the draft, explaining: "as I'm putting this last beat together, I'm thinking that we should ID all of the hostile jets via a singular paint scheme." A-5047.

These are working communications of a collaborating screenwriter: one furnished with Paramount's material by Singer and Kosinski, assigned scenes to write, and trusted to merge his own pages and the director's notes, that Gray agreed with, into the draft Singer delivered to Paramount.

Several development sessions were recorded,[3] capturing Gray composing the radio dialogue and action beats that appear, verbatim, in the November 3, 2017

---

[3] Exhibits 63–65 are audio recordings of the *Maverick* development sessions, lodged in the appendix (Ex. 63, A-5299; Ex. 64, A-5301; Ex. 65, A-5303).

9

"Singer Draft" submitted to Paramount and in the registered Gray Scenes. *Compare* A-5303 at 08:26–08:38 *with* A-471, A-488-489, A-1975. *Compare also* A-5303 at 16:37 *with* A-492. *Compare further* A-5303 at 17:03 *with* A-475.

The recordings also show Gray's recognized place at the writing table. Singer turned the floor over to him to question *Paramount's* Navy consultants directly, "[Shaun]'s going to ask, go ahead." (A-5303 at 21:08). Gray earlier asks "what would be the radio chatter for the Echoes as they're moving into the maneuver." (*Id.* at 06:29–06:46). That craft question shaped the briefing scene Gray wrote, compared just above. A-471. This is conduct of a participating writer in an authorized development process. As the district court described it, Gray "played a significant role in drafting" and "participat[ed] in story meetings with Singer and Kosinski." A-10481.

The many sequences Gray wrote are the screenplay and film's central edge-of-your-seat dramatic action set pieces—the heart of the film. The fifteen discrete Gray Scenes account for 58% of the Singer Draft, including the majority of its third act, as Kosinski was aware. A-4033; A-7428–A-7429. They open the picture: Maverick, in the cockpit of an "experimental fighter jet prototype," answers an officer's "How do you read?" with "Loud and clear," flips his switches, and rides the "whining" engines and "blue fire" exhaust aloft as the test flight begins. A-42-43. Others stage the aerial combat that follows—the fighter maneuvers and dogfights

10

with enemy aircraft, which Gray distinguished by paint scheme as he was "putting this last beat together." A-5047. And the climactic third-act mission is Gray's from approach to escape: the strike team drops "into a jagged-maw of a valley" on the deck, runs a gauntlet of surface-to-air missiles, and bears down on an enemy "Nuclear Facility"; the targeting pod's laser locks ("Captured"), Maverick counts the dive down to "Pickle," the bunker-busters punch through concrete with a "WHOOOMP" ("Shack good impact"), and the crew breaks for the egress under a shoulder-fired "STINGER" as Maverick radios "Flow egress. Miller time." A-488–A-492; *see* A-7436–A-7437 (Gray Scenes 4–13). These are just some of many examples of Gray's own original expression—his staging of the action, his radio dialogue, his selection and ordering of beats—fixed by him in discrete written scenes, registered with the Copyright Office.

The scenes were not generic. Gray's Complaint details, in a three-column "Chart of Similarities," "approximately ninety examples of significant overlap between the works" (the phrase is the district court's, A-1079), matching the registered Gray Scenes against Paramount's final *Maverick* screenplay and film, sorted by Plot, Dialogue, Setting, Pace, Mood, Themes, and Characters. A-41–A-64. The similarities are often verbatim. For example, in one Gray Scene, "Lardo tells Maverick over radio as he is in flight: 'You are cleared above flight level six zero zero, accelerate to Mach 3.5.'" A-42. The district court found that "in both the

11

screenplay and the Film, a character 'Hondo' tells Maverick in flight: 'You are cleared above flight level six zero zero, accelerate to Mach 3.5.'" A-1079. At the pleading stage the district court credited the numerous detailed comparisons between the Gray Scenes and *Maverick* as more than sufficient to allege substantial similarity. A-1079.[4]

### 3. *Maverick's release, prompting Gray's demand.*

*Top Gun: Maverick* was released in May 2022 to enormous success. A-117. Gray received no writing credit and no compensation.[5] That he did not come forward sooner is explained, in the record, by Singer's assurances and by Gray's inability to know the film's content until its release. A-4063–4065. Singer, Gray's older cousin, whom he "looked up to as like a big brother" and who called himself Gray's "guardian in the business," had manipulated Gray. A-3964. Their understanding,

---

[4] Copying is not in doubt: Singer carried Gray's scenes into the Singer Draft and the Complaint documents the similarities with *Maverick*. A-1079.

[5] Paramount points to a $20,000 check Singer sent Gray oddly bearing the notation "Top Gun," *21 months* after the Gray-Singer screenplay was sent to Paramount. A-2642-2643. Gray testified that this was not for *Maverick*; his compensation was to be a share of the back-end, after *Maverick's* release. A-3997. When the check arrived, Gray "called [Singer]…and said, 'Why does it say "Top Gun" on it? You are still paying me back for "Marita" and "Only the Brave,"' earlier projects the two had worked on. Singer, he testified, answered, "Oh, I forgot," and Gray "just assumed it was a mistake," because Singer "had never written anything on a check prior to that." A-3997-3998. On Gray's sworn account, the lone "Top Gun" notation reflects a mislabeled repayment for other work, not compensation for the *Maverick* screenplay; its weight is for the jury.

Gray testified, "was very clear": "I was not writing unless I was getting credited," and Singer "was supposed to put our names on the script when it went into the studio"; but "the day that it went into the studio, he gave me a new story of why I had to wait." A-3913. First the studio relationship, then the WGA credit arbitration Singer insisted on handling alone, then the pandemic: Singer "kept saying COVID was slowing everything down and I just had to wait." A-4065. Only when the film came out, and Gray saw "all [his] work …still in there," did he "realize[] that Eric had completely lied to [him]." A-3965. In January 2023, through prior counsel, Gray wrote Paramount describing his contributions and seeking recognition. Paramount refused to engage, causing Gray to file this action in April 2025.

Notwithstanding Gray's time-stamped Gray Scenes and emails furnishing them to Singer, and demonstrating Gray's origination, Paramount's litigating position has always been that Gray was merely Singer's administrative assistant, and that his use of *Top Gun* was unauthorized.[6] It relies on boilerplate in Singer's

---

[6] Paramount had to admit for purposes of summary judgment, and the district court accepted, that Gray actually wrote the Gray Scenes and was not Singer's administrative assistant. Paramount, however, has consistently embraced Singer's sworn testimony that Gray wrote *nothing*, despite ample record evidence proving Singer to be untruthful. *See* Part C, *supra* & A-5244; A-5249. A-5291; A-5212; A-5052. The claim that the screenplay was "solely written by" Singer, A-2952, and that Gray contributed nothing, is refuted not by Gray's say-so, but by time-stamped files originating the Gray Scenes, A-7435–7438, and contemporaneous statements by Paramount's principal witnesses, A-5208, A-5212, A-5052, A-6779, A-7427.

13

agreement that "[t]he Material shall be solely written by Writer and shall be wholly original with Writer," A-2952; on a confidentiality agreement relating to an old project it characterizes as reflecting that Gray was Singer's assistant, A-2619; and on an internal studio email stating that "[Singer's] assistant, Shaun Gray, will require a drive-on," A-3843. Those documents are evidence Paramount may present to a jury. They do not establish, as a matter of law, that Gray's writing was unlawful, particularly against the "either alone or in collaboration with others" terms of the same Paramount agreements and the court's finding that Singer and Kosinski were authorized to use the underlying *Top Gun* material in developing its sequel.[7] After Gray sued, Paramount asserted counterclaims for copyright infringement and common-law fraud, both of which depend on the same "unauthorized" contention.

## B.    Procedural History

Gray's Complaint pleaded three claims: (1) a declaratory judgment of joint authorship and co-ownership of the *Maverick* screenplay; (2) an accounting for profits, and (3) in the alternative, copyright infringement of the registered Gray Scenes. A-23. After the court's pleading-stage ruling, the parties completed

---

[7] Paramount's reliance on these fatally ambiguous documents illustrates the dispute; it does not resolve it. The "solely written" warranty is Singer's representation to Paramount; it does not bind the non-signatory Gray, and it cannot be reconciled, on summary judgment, with the "either alone or in collaboration with others" term of the same agreement. A-2951–2952.

discovery and cross-moved for summary judgment, yielding the opinion now under review.

*The motion to dismiss.* The district court, Hon. Jed S. Rakoff, dismissed Gray's joint-authorship and accounting claims, but sustained his infringement claim. On joint authorship, the court held that Gray cleared the first prong of the test: "Gray has sufficiently alleged that he made independently copyrightable contributions to the Film and its screenplay." A-1070. It dismissed nonetheless, and with prejudice, as to the element of mutual intent stating: "Gray has failed to plausibly allege that PPC intended for him to be a joint author or that Singer or Kosinski bound PPC to such a relationship via actual or apparent authority." A-1075. In a footnote, it denied leave to amend. A-1075 n.6. The court refused, however, to dismiss Gray's copyright infringement claim. It found "approximately ninety examples of significant overlap between the works," A-1079, and rejected Paramount's argument that the scenes were categorically unprotectable under *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247 (2d Cir. 2015) ("*Casa Duse*"): "[T]his case is readily distinguishable from *Casa Duse*, where the alleged works of authorship were creative contributions that the director had made regarding 'camera angles and lighting to wardrobe and makeup to the actors' dialogue and movement.'" A-1080.

*Summary judgment.* On cross-motions, the district court granted Paramount's motion and denied Gray's. It rejected Paramount's work-for-hire theory as a ground

15

for judgment, holding that Gray's evidence "is sufficient to make this a jury question." A-10485. It relied entirely on Paramount's erroneous theory the Gray Scenes "are themselves infringing derivative works that cannot be copyrighted." A-10485. Reasoning that "it is self-evident that the Gray Scenes are materially based on the *Top Gun* universe, including characters, settings, and plot devices, as one would expect of such a sequel," A-10486, the court concluded: "Gray's copyright is therefore invalid. And even if one could somehow point to something in the Gray Scenes that is arguably distinct from the *Top Gun* universe, the derivative features still supply the entire context and foundation in ways that totally invade Paramount's prior copyright of *Top Gun*." A-10489. The court dismissed the infringement claim and "preserved for trial" Paramount's counterclaims. A-10496.

*The judgment.* The district court entered a Rule 54(b) judgment on the entire Complaint and stayed the counterclaims. A-10528. This appeal followed.

## SUMMARY OF ARGUMENT

The judgment is the product of two errors. It misread § 103 to forfeit Gray's original expression that the statute preserves; and twice resolved a disputed, jury-bound question against the author instead of crediting his well-pleaded allegations and evidence on Paramount's summary-judgment motion. Correcting those errors resolves this appeal.

16

*First*, the wholesale invalidation of Gray's registered copyright should be reversed because it contravenes § 103. The statute withholds protection only from "any part of the work in which such material has been used unlawfully," 17 U.S.C. § 103(a), and reserves to the derivative author "the material contributed by the author of such work." § 103(b). It commands courts to filter, not to forfeit. The district court did the opposite: it conceded that the Gray Scenes may contain expression "arguably distinct from the *Top Gun* universe," A-10489, yet invalidated the entire copyright— including Gray's contributions it had already held sufficiently alleged to be "independently copyrightable," A-1070—without separately considering Gray's original expression. That threshold error requires reversal, and the issue was at minimum triable, even if Gray's use of *Top Gun* material, furnished *directly* to him by Paramount's own writer and director, had somehow been unlawful.

*Second*, the summary judgment fails on its own premise as well: Gray's use was not unlawful or, at the very least, a jury could so find. The district court did not hold that Gray's writing did not include substantial original expression, or that he failed to register it with the Copyright Office; it assumed his registration presumptively valid. A-10484. Nor did it hold that Paramount owned Gray's material as work-for-hire; finding that question fit only for a jury. A-10485. Judgment rested on a single proposition: that the Gray Scenes are *unauthorized* derivative works. But whether Gray's partial use of *Top Gun,* within the

17

development process Paramount authorized Singer and Kosinski to conduct, was unauthorized, raises questions of agency, actual or apparent authority, or implied license that the record left genuinely disputed. An agent's authority reaches the "acts necessary or incidental to achieving the principal's objectives," Restatement (Third) of Agency § 2.02(1) (2006), and the scope of that authority, like any agency question, is for the jury. On Paramount's motion, those fact-bound disputes had to be resolved in Gray's favor, not against him.

*Third*, the dismissal of Gray's joint-authorship claim with prejudice should be reversed. The district court accepted that Gray pleaded an independently copyrightable, fixed contribution, the first element of co-authorship. *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998). It dismissed only on mutual intent—an inquiry that is fact-intensive and contextual—by weighing credit, control, and contractual inferences against Gray, instead of in his favor as required by Rule 12. The court hinged its dismissal on agency, faulting Gray for not "adequately" alleging that "Singer or Kosinski bound PPC…via actual or apparent authority," A-1075. Yet Gray expressly alleged that "[b]oth Singer and Kosinski represented themselves to Gray as having the authority and the approval of PPC and/or had the apparent authority of PPC to involve Gray in the project." A-27–A-28. Moreover, agency is a paradigmatic fact question, and "[s]lavish deference to contractual language is inappropriate in the highly-factual and often nuanced agency analysis." *Cleveland v.*

18

*Caplaw Enters.*, 448 F.3d 518, 523 (2d Cir. 2006). Worse, the district court foreclosed amendment with prejudice based on an oral-argument colloquy, without identifying a deficiency that amendment could not cure, and the summary-judgment record later confirmed the very facts the court thought missing. Because mutual intent turns on a contextual assessment that this Court's precedents commit to a developed record, Gray's burden was not to prove that intent on the pleadings, only to allege, as he did, facts from which it could reasonably be inferred.

Across all three issues the common thread is a court that decided for itself questions the law assigns elsewhere—to Congress's statutory design, and to the jury—as part of an unusually rapid path to judgment.[8] The remedy is to return these issues for determination by a jury in ordinary course.

## STANDARD OF REVIEW

This Court reviews both rulings de novo. A Rule 12(b)(6) dismissal presents "a question of law, which we consider de novo," accepting "well pleaded factual assertions as true" and "draw[ing] all reasonable factual inferences in favor of the

---

[8] The judgment came on an unusually compressed schedule. Gray filed suit on April 27, 2025, A-23; the court issued its motion-to-dismiss opinion on August 8, 2025, A-1063. After failing to provide Gray a single opportunity to amend his joint authorship claim, it adopted an expedited discovery schedule closing that fall, A-70–71, and entered final judgment under Rule 54(b) on February 9, 2026, A-10531 — resolving a multi-claim copyright action, through pleadings, full discovery, and cross-motions for summary judgment, in roughly nine months. The same unnecessary urgency marked the discovery rulings. *See* A-1260.

19

plaintiff." *Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020). A grant of summary judgment is reviewed "de novo…after construing all evidence, and drawing all reasonable inferences, in favor of the non-moving party." *Sotomayor v. City of New York*, 713 F.3d 163, 164 (2d Cir. 2013). Summary judgment "will not lie" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and "the judge's function is not himself to weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255. Whether a work qualifies as a work made for hire is also reviewed de novo. *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992).[9]

## ARGUMENT

I. **THE WHOLESALE INVALIDATION OF GRAY'S COPYRIGHT CONTRAVENES THE STATUTE'S TEXT, ITS HISTORY, AND THIS COURT'S PRECEDENT, AS SECTION 103 CONFINES ANY FORFEITURE TO THE PARTS OF A WORK WHICH USED PREEXISTING MATERIAL UNLAWFULLY.**

This Court can reverse the judgment on Gray's infringement claim without resolving a single disputed fact. The district court invalidated Gray's registered

---

[9] On cross-motions, the court evaluates each motion on its own terms, drawing all reasonable inferences against the movant. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). As to Paramount's motion, which the court granted, every reasonable inference was owed to Gray.

copyrights wholesale, on the theory that the Gray Scenes "are themselves infringing derivative works that cannot be copyrighted." A-10485. But § 103(a) withholds protection only from "any *part* of the work in which such material has been used unlawfully," 17 U.S.C. § 103(a) (emphasis added), and § 103(b) reserves to the derivative author "the material contributed by the author of such work, as distinguished from the preexisting material employed in the work." The statute thus commands courts to filter, not to forfeit. "The aspects of a derivative work added by the derivative author are that author's property." *Stewart v. Abend*, 495 U.S. 207, 223 (1990).

This threshold ground for reversal prevails even on the district court's own premise. Gray does not concede that his use of *Top Gun* material was unlawful, because his use *was* authorized (*see* Argument II *infra*) and/or, as Paramount itself has argued in *Yonay v. Paramount Pictures Corp.*, 163 F.4th 685, 694 (9th Cir. 2026), many of *Top Gun*'s factual and generic elements are in the public domain. However, even if the Court concludes otherwise, forfeiture would reach only the offending parts under § 103(a)—not Gray's separable original expression, protected under § 103(b). The court's merits passage concedes the error: "Gray's copyright is therefore invalid. And even if one could somehow point to something in the Gray Scenes that is arguably distinct from the *Top Gun* universe, the derivative features still supply the entire context and foundation in ways that totally invade Paramount's

21

prior copyright of *Top Gun*." A-10489. The court thus acknowledged that "arguably distinct" expression may be present and forfeited it anyway, without analysis. It filtered nothing contrary to § 103, and forfeited everything.

In so ruling, the district court contradicted its own prior opinion that the "central contention—that 'a derivative work[ ] cannot be protected by copyright without the permission of the original copyright owner'—is a 'contention [with] no basis in law.'" *Poppington, LLC v. Brooks*, No. 20-CV-8616 (JSR), 2021 WL 3193023, at *5 (S.D.N.Y. July 27, 2021) (quoting *Keeling v. New Rock Theater Prods., LLC*, 2011 WL 1899762, at *1 (S.D.N.Y. May 17, 2011)).

## A. Section 103's Text and History Confine Forfeiture to the Unlawfully Used Parts of a Work and Reserve the Author's Own Contribution to the Author.

The text is precise:

(a) The subject matter of copyright as specified by section 102 includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully. (b) The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material.

17 U.S.C. § 103.

The operative phrase is "part of the work": Congress withheld protection from the offending part, not the entire work. The Supreme Court has described § 103(b)

22

as the codification of a "well-settled rule," *Stewart*, 495 U.S. at 224; see also *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 494 (2001) (analogously, a collective-work copyright "extends only to the creative material contributed by that author").

Section 103's legislative history confirms what the text commands:

> In providing that protection does not extend to "any part of the work in which such material has been used unlawfully," *the bill prevents an infringer from benefiting, through copyright protection, from committing an unlawful act, but preserves protection for those parts of the work that do not employ the preexisting work.* Thus, an unauthorized translation of a novel could not be copyrighted at all, but the owner of copyright in an anthology of poetry could sue someone who infringed the whole anthology, even though the infringer proves that publication of one of the poems was unauthorized.

H.R. Rep. No. 94-1476, at 57-58 (1976) (emphasis added).

Congress thus drew precisely the line the district court erased. The Ninth Circuit reads the statute as written. "In short, § 103 provides that a derivative author may own the copyright in material the author contributed to a preexisting work, but not in infringing material or material the author did not create." *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1016 (9th Cir. 2012).

The design is deliberate. "The sine qua non of copyright is originality," *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). "Copyright in a work …vests initially in the author or authors of the work." 17 U.S.C. § 201(a). "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright

23

protection." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). For those reasons § 103(b) reserves to the derivative author, here Gray, exactly what copyright exists to secure: his own original expression.

### B.     This Court's Decisions Command Separation, Not Forfeiture.

The rule § 103(b) codified is this Court's own. In *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469 (2d Cir. 1951), this Court allocated rather than forfeited: the plaintiff's "renewal copyright of the opera gives it rights only in the new matter which it added to the [underlying] novel and the play," and the underlying-rights owner, Paramount, "may not make use of the plaintiff's opera without its consent." *Id.* at 471-472. The Court barred Paramount from appropriating the opera's new matter without consent. So too here as to Gray's scenes.

This Court emphasized only last year that a derivative work "is itself independently copyrightable." *Atticus Ltd. Liab. Co. v. Dramatic Publ'g Co.*, 145 F.4th 257 (2d Cir. 2025). That recent reaffirmation carries this Court's allocation rule forward to the present day: under § 103(b), the derivative author's own contributions are protected, independent of the preexisting work it draws on.

Protection reaches "the non-trivial, original features…contributed by the author" of a derivative work. *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 909 (2d Cir. 1980). In *Weissmann v. Freeman*, this Court reversed a judgment that flouted that separation, rejecting a contrary rule that would "eviscerate the

24

independent copyright protection that attaches to a derivative work that is wholly independent of the protection afforded the preexisting work." 868 F.2d 1313, 1317 (2d Cir. 1989). Such protection is just as "fully applicable to works that provide further delineation of characters already sufficiently delineated to warrant copyright protection." *Silverman v. CBS Inc.*, 870 F.2d 40 (2d Cir. 1989).

Contrary to the district court's judgment, Section 103(a) draws its line at unlawful use of "part[s]" of a derivative work, not derivativeness itself: the bar reaches only material "used unlawfully," and "[i]t is the originality of the derivative work that makes it protectable." *Keeling v. Hars*, 809 F.3d 43, 48-50 (2d Cir. 2015).

As § 103(a)'s "used unlawfully" predicate applies only to *protectable* elements of the underlying work, the threshold question is which features of *Top Gun* are copyright-protected. *See JBJ Fabrics, Inc. v. Brylane, Inc*., 714 F. Supp. 107, 110 (S.D.N.Y. 1989) ("unauthorized use is not equivalent to unlawful use." (citing *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34 n.6 (2d Cir. 1982), *superseded on other grounds*)). The district court never undertook that filtration; instead, it treated *all* of *Top Gun*, including its unprotectable public-domain elements, stock tropes and scènes à faire, its sequel necessarily shared, as Paramount's *exclusive* property, then declared any use of it by Gray, unlawful.

Whereas here Paramount argued, and the district court wholly adopted, a proprietary *Top Gun* "universe" (based on one film), in *Yonay v. Paramount Pictures*

25

*Corp.*, Paramount successfully argued to the Ninth Circuit that the Navy's actual "Top Gun" flight school, its settings, aircraft, training regimen, and themes are unprotected facts, ideas and scenes a faire, free for anyone's use. 163 F.4th at 694. That comprises much of the same *Top Gun* "universe" the district court relied upon, at Paramount's urging, to forfeit Gray's entire copyright. Section § 103(a)'s focus on "unlawful[]" use requires exactly that filtration of unprotectable elements here. Paramount cannot have it both ways and is judicially estopped from arguing the opposite: the many *Top Gun* elements it disclaimed as unprotectable in *Yonay* must be filtered out, not used to forfeit Gray's original expression. *Wight v. BankAmerica Corp.*, 219 F.3d 79, 89–90 (2d Cir. 2000) (judicial estoppel prevents litigants from "play[ing] fast and loose with the courts.")

Nor does *Casa Duse*, on which Paramount leaned below, point the other way. 791 F.3d 247. *Casa Duse* asked whether copyright subsists *at all* in a *film director's* contributions "inseparable from, and integrated into" a film, and it said nothing about forfeiture. *Casa Duse* considered the havoc which would ensue if film crew members (e.g., director, cinematographer, set and costume designers, cast) were each considered the film's co-authors and co-owners. *Id*. at 259-260. The district court itself recognized that *Casa Duse* did not control, holding that "this case . . . [is] readily distinguishable from *Casa Duse*." A-1080.

26

No decision of this Court holds under § 103 that a bare finding of unlawful use of an underlying work forfeits the derivative author's separable original expression wholesale, and the statute's text forecloses such a ruling.

### C. The District Court's Rationale Inverts the Statute and Stretches *Anderson* and *Wozniak* Far Beyond Their Holdings.

The district court engaged little of the above law governing derivative works. It held that "it is self-evident that the Gray Scenes are materially based on the *Top Gun* universe, including characters, settings, and plot devices, as one would expect of such a sequel," A-10486, and that because these derivative aspects supply the Gray Scenes' "context and foundation" they "totally invade" Paramount's copyright. A-10489. But borrowing is the definition of a derivative work; it is not synonymous with forfeiture: "By its very nature a 'derivative' work, which is copyrightable as such, borrows substantially from existing works, and is so defined." *Eden Toys, Inc.*, 697 F.2d at 34. The court's own aside—"as one would expect of such a sequel"— concedes the point. Its holding that originality does not matter when a work is set in a preexisting framework constitutes forfeiture, not filtration, and is foreclosed by § 103(b).

The two district court decisions the court invoked do not carry the weight. A-10485–A-10489. In *Wozniak*, copyright protection was denied to his wholly *unsolicited* script where he used "protected elements of the Batman Universe…without DC Comics' permission" that "pervade[d] the entire derivative

27

work." *Wozniak v. Warner Bros. Ent., Inc.*, 726 F. Supp. 3d 213, 237 (S.D.N.Y. 2024). Wozniak lost because both predicates were undisputed. *Id.* at 238-39 (listing nine characters and numerous copyright-protected *Batman* elements lifted without change). By contrast, here, fact-intensive issues as to (i) agency and actual or apparent authorization and (ii) the separability of Gray's significant contributions from any use of protected *Top Gun* elements, are all sharply disputed and supported by the evidentiary record. The court found that Paramount authorized the development process at issue, A-10480, as shown in both Singer and Kosinski's contracts, A-2951; A-4537, and recounted that Singer "asked [Gray] to join in writing" the screenplay, and that Gray "played a significant role in drafting this screenplay…participating in story meetings with Singer and Kosinski and discussing notes received from producers." A-10481. *See* Argument II *infra*.

*Anderson* is no broader. There, a person with no authority or license prepared an *unsolicited* treatment for a fourth *Rocky* film and lost on Stallone's infringement counterclaim. *Anderson v. Stallone*, 1989 WL 206431, at *1 (C.D. Cal. Apr. 25, 1989). *Anderson* punishes the unlicensed taking of another's work; it does not transform contested authorization into unlawful use.

The "pervade" formulation underlying these cases, adopted by this Court in *Eden Toys*, 697 F.2d at 34 n.6, is a limitation on forfeiture, not a warrant for it. Invalidity attaches *only* where copyright-protected material used without permission

28

"pervade[s] the entire derivative work," *id.*, and "unauthorized use is not equivalent to unlawful use." *JBJ Fabrics, Inc.*, 714 F. Supp. at 110 (citing *Eden Toys*, 697 F.2d at 34 n.6). "[E]ven if plaintiff's use of the underlying design were unlawful, it would be entitled to protection for its original contributions absent some showing by defendant that the unlawful use pervaded the entire work." *Id.*; *see Caffey v. Cook*, 409 F. Supp. 2d 484, 496 (S.D.N.Y. 2006) (original compilation protected "notwithstanding plaintiffs' failure to obtain prior authorization").

No court can make that finding without first determining (i) the degree to which used portions of the underlying work are copyright-protectable, rendering unauthorized use "unlawful" under § 103(a); (ii) the original portions contributed by the author of the derivative work and (iii) whether the protected portions of the underlying work so pervade *all* of the derivative author's material that it is literally impossible to segregate it for due protection under § 103(b). Yet the district court engaged in *none* of this analysis, and assumed pervasion in determining that Gray forfeited the entirety of his copyright interests. *See* A-10486 ("it is self-evident that the Gray Scenes are materially based on the *Top Gun* universe); A-10489 ("Gray's copyright is therefore invalid. And even if one could somehow point to something in the Gray Scenes that is arguably distinct from the *Top Gun* universe, the derivative features still supply the entire context and foundation in ways that totally invade Paramount's prior copyright of *Top Gun*.").

29

Where derivative works contain original parts, like the Gray Scenes obviously do, pervasion is a question for the factfinder. In *Hiller*, the Sixth Circuit affirmed a jury verdict in favor of the derivative author, notwithstanding a "pervades" instruction, holding that "even if the jury determined that the Guide is a derivative work, Hiller would still retain its copyright in any discrete parts of the Guide that were not copied from the Manuals." *Hiller, LLC v. Success Grp. Int'l Learning All., LLC*, 976 F.3d 620 (6th Cir. 2020) (citing § 103). By contrast here, the district court's rationale proves far too much: if "context and foundation" forfeit whatever is "arguably distinct," A-10489, no writer of any sequel material could ever hold the copyright § 103(b) promises.

### D. On This Record, Wholesale Forfeiture Was Impossible as a Matter of Law, and, at Minimum, Separability Was a Question For the Jury.

Here, the court's own rulings foreclose wholesale forfeiture. At the pleading stage, the court held that "Gray has sufficiently alleged that he made independently copyrightable contributions to the Film and its screenplay," A-1070, and credited "approximately ninety examples of significant overlap between the works." A-1079. On summary judgment, it "assume[d] for the purposes of Paramount's motion that Gray's copyright is presumptively valid." A-10484. Having credited independently copyrightable contributions at the pleading stage, assumed a presumptively valid registration, and conceded that "arguably distinct" expression may be present, A-10489, the court could not declare as a matter of law that nothing in the Gray Scenes

30

was protected. On the court's own rulings, judgment as a matter of law for Paramount was foreclosed; and, at a minimum, separability was for the jury.

The statutory presumption compounds the error. A "certificate of copyright registration is prima facie evidence that the copyright is valid," and the registrant's proffer of his certificate "shifts to [the challenger] the burden of proving the invalidity of the copyright…and there the burden rests, unless the presumptions are rebutted." *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997); *see* 17 U.S.C. § 410(c); *Boisson v. Banian, Ltd.*, 273 F.3d 262 (2d Cir. 2001) (presumption extends to the originality of constituent elements, which the challenger bears the burden of disproving). Paramount, as movant and the party rebutting the presumption, had to establish as a matter of law that nothing in Gray's fifteen registered scenes was his own. It could not; nor could the court weigh the record for it. *Liberty Lobby, Inc.*, 477 U.S. at 255.

The evidentiary record documents Gray's separable expression. Crediting that some idea of Maverick (a much younger version) is borrowed, the Gray Scenes are *not* so "pervaded" by copyright-protectable *Top Gun* elements, such that Gray's substantial contributions are inseparable and unprotected under § 103(b). Gray's separable construction supplies the dramatic architecture of the scenes themselves—the situation, the order and escalation of the story beats, the staging, and the suspense—none of which depends on Maverick. For instance, Gray's opening test-

31

flight scene, which has no analogue in *Top Gun*, is built on an ascending numerical ladder of Mach and altitude, called aloud against Mission Control's stated limits as the suspense engine: Mach 3.5 cleared, A-4596; 5.4, then 6.0 as the skin is "starting to heat up," A-4597; "7.8, 7.9, 8.0!...Fastest man alive!", A-4598; on to 9.0 and "close to an unstart," A-4599; ending in the unstart that rips the aircraft apart, A-4600. That a sequel's hero again flies a (far different) jet does not make Gray's exhilarating action scene in a new setting any less protectable under § 103(b). The sequence is built from Gray's original action beats, not lifted from *Top Gun*.

The climactic third-act mission is likewise Gray's from approach to escape—a sustained, original action sequence that is protectable, independent of any character carried over from *Top Gun*. A-488–A-492; see A-7436–A-7437 (Gray Scenes 4–13). The third-act strike is on a land facility, again with no analogue in *Top Gun*, and built on a deliberately ordered obstacle gauntlet—a jagged valley, a mobile-radar re-route, a saddle ridge flown underneath power lines, an undetected pass of a dormant SAM launcher—punctuated by Gray's chosen suspense device, a cutaway to a lone enemy watch-post whose soldier's cell phone reads "No signal," delaying the alarm. A-486-488.

Across two of his scenes, Gray also arranges the payoff for an older, wiser, sadder Maverick, one who is a teacher, not a student, at the end of his career rather than the beginning. The attack profile Gray's Maverick attempts to teach fails again

32

and again in training—"Negative impact" recurring as a refrain, A-474–A-477—before it must finally succeed at the climax, A-488–A-492, with Gray dictating the editorial rhythm on the page ("[f]rom this point on the shots of this sequence become progressively shorter and faster, building up to a frenetic intensity"), A-474. The same cockpit-versus-command-center cross-cuts structure both scenes. A-4595-4600; A-484-489. It is Gray's protectable selection, ordering, and staging—not the borrowed material's—that creatively express these scenes.

The district court found otherwise without ever reaching or evaluating the scenes. It declared that the derivative features "supply the entire context and foundation in ways that totally invade Paramount's prior copyright," A-10489, but it identified no protectable element of *Top Gun* as the source of Gray's scene-level construction and performed no scene-level analysis to even begin to support its broad conclusion. Indeed, the evidentiary record runs the other way.

On this record the district court's pervasion finding rested on a label, not on any showing that *Top Gun* supplied the detailed expressive architecture of these scenes—and that label cannot do the work that § 103(a) reserves for filtered inquiry into what, if anything, was used unlawfully and § 103(b) reserves for part-by-part analysis of what is original to the derivative author.

The originality bar for protection of material added by an author to a derivative work is minimal, *Feist*, 499 U.S. at 345; the author need contribute only

33

"something more than a 'merely trivial' variation, something recognizably 'his own.'" *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 102-03 (2d Cir. 1951). The original dialogue and action in the many key scenes authored by Gray satisfy this requirement *many times over*.

Aside from the fact-laden authorization issue (*see* Argument II, *infra*), the requisite analyses which the court failed to conduct (i) under § 103(a), of which *Top Gun* elements were protected such that their use was even arguably "unlawful" and (ii) under § 103(b) as to the "material contributed by" Gray "as distinguished from the preexisting material" is akin to the everyday, fact-intensive tasks in copyright-infringement litigation. Yet, the district court performed none of this.

At the very least, separability was a question the court could not resolve against Gray on summary judgment. Even a court persuaded that the author copied protected material without authorization "would also need to conclude, as a matter of law, that the purportedly cribbed portions so 'pervade' the works that they render them completely unprotected under the Copyright Act," and on a record showing many original portions of the Gray Scenes not traceable to the underlying work, that determination belongs to the jury. *Wolf v. Travolta*, 167 F. Supp. 3d 1077 (C.D. Cal. 2016) (denying summary judgment that unauthorized copying invalidated the plaintiffs' copyrights); *see also U.S. Auto Parts*, 692 F.3d at 1016 (under § 103, "a derivative author may own the copyright in material the author contributed to a

preexisting work," and reversing summary judgment because that was a triable issue). On this record, no factfinder would be compelled to conclude that *Top Gun* material pervaded every part of all fifteen of the Gray Scenes.

As the court erroneously declared that Gray held no copyright interest at the threshold, it never asked whether the accused film is substantially similar to the protectable expression in the Gray Scenes.[10] Even a narrow derivative-work copyright remains enforceable against the copying of the expression it protects, *Durham*, 630 F.2d at 909, and the overlaps documented in the Complaint are frequently verbatim: Gray's "You are cleared above flight level six zero zero, accelerate to Mach 3.5" line and the "THUNDEROUS PEAL as the SCRAMJET engine bursts into life" beat among them. A-42-43 (chart cross-citing the *Maverick* screenplay (pp. 7–8, 14) and film (06:48–09:05) for these beats); A-1079-1080 (court finding the screenplay "repeats this same language nearly verbatim" and that the Film "depicts this same sequence"). Those are illustrations, not isolated snippets: the same verbatim correspondence runs through the central action sequences Gray wrote which comprised the heart of the film. A-488-489; A-492; A-1975; A-2005. Whether Gray's original expression was copied, and whether the copying was substantial, are jury questions that remain open on remand. The

---

[10] At the pleading stage the district court credited the numerous detailed comparisons between the Gray Scenes and *Maverick* as more than sufficient to allege substantial similarity. A-1079.

wholesale invalidation of Gray's registered copyright contravenes § 103's text, its legislative history, and this Court's precedent. The judgment on Gray's infringement claim should be reversed.

## II. THE DISTRICT COURT ERRED IN INVALIDATING GRAY'S COPYRIGHT ON SUMMARY JUDGMENT, BECAUSE THE RECORD RAISES TRIABLE DISPUTES OVER WHETHER GRAY'S USE WAS AUTHORIZED.

The district court's summary judgment ruling rests on the erroneous proposition that the Gray Scenes are unprotectable because they are "unauthorized" derivative works of *Top Gun*. A-10485-10489. That proposition cannot be sustained on this record. Argument I addressed the court's statutory error in misconstruing §§ 103(a) and (b). This argument addresses the district court's antecedent error in finding the use of *Top Gun* in the Gray Scenes unlawful without identifying any basis beyond their derivative nature. It equated "derivative" with "unlawful," and resolved against Gray, as a matter of law, the fact-intensive authorization question on which unlawfulness depends. This error requires reversal because the issue of Singer and Kosinski's agency and authorization—whether constituting actual or apparent authority, or an implied license—was for a jury, not summary judgment.

As discussed *supra*, the two cases the court relied upon, *Stallone,* 1989 WL 206431, at *1, and *Wozniak*, 726 F. Supp. 3d 237-38, involving *unsolicited* uses, do not support summary judgment, precisely because in both cases the total lack of any semblance of authorization to use the underlying works was *undisputed*.

Here, by contrast, there are factual issues for a jury as to at least three independent routes to authorization. *First*, a jury could rationally conclude that the film's director, Kosinski, and screenwriter, Singer, were Paramount's agents with actual authority to involve Gray in *Maverick's* screenplay development process. *Second*, a jury could rationally conclude that Kosinski and Singer acted with apparent authority when they involved Gray in developing the screenplay, and that Gray reasonably relied on their appearance of authority. *Third*, a jury could rationally conclude Gray was impliedly licensed *Top Gun* materials to use in the sequel's scenes he was invited to write. Any one of those findings would mean that Gray's use of *Top Gun* was not unlawful.

**A.    Whether Singer and Kosinski Were Paramount's Agents or Had Actual or Apparent Authority to Involve Gray in Their Screenplay Development Process Had to Be Resolved in Gray's Favor on Summary Judgment and Was Triable.**

Initially, the analysis must begin with Gray's copyright registrations, which entitled him to a statutory presumption of validity. A "certificate of copyright registration is prima facie evidence that the copyright is valid," and the registrant's "proffer of its certificate…shifts to [the challenger] the burden of proving the invalidity of the copyright…and there the burden rests, unless the presumptions are rebutted." *Domenick*, 105 F.3d at 104; *see* 17 U.S.C. § 410(c). The district court did not question this presumption; it "assume[d] for the purposes of Paramount's motion that Gray's copyright is presumptively valid." A-10484. Paramount thus bore the

37

burden of rebutting validity, and its only surviving theory of partial rebuttal, "unlawful" derivation under § 103(a), required it to prove that Gray's use of protectable *Top Gun* elements was unauthorized.[11] Because authorization turns on disputed facts it presented a jury question and, on this record, a reasonable jury could find Gray's use of *Top Gun* authorized. Paramount could therefore not rebut the presumption of validity as a matter of law.

*First*, as to actual authority, all evidence confirms the studio authorized the derivative use of *Top Gun*, both expressly and inherently as *Maverick* is its sequel. A-10480. The district court found it undisputed that "Paramount authorized Singer and Kosinski to use Paramount's preexisting *Top Gun: Maverick*-related materials, including the original *Top Gun* film, to develop the screenplay." A-10480. The district court itself acknowledged that Singer "asked [Gray] to join in writing" the screenplay that "Singer submitted to Paramount." A-10481. The dispute is whether Gray, working at the invitation and under the supervision of Kosinski and Singer, Paramount's director and writer, shared in their authorization. That presents a triable question of agency, actual or apparent authority, or license.

---

[11] Paramount's alternative theory below, that it owned the Gray Scenes as "works made for hire," cannot carry the judgment: Paramount, as "the party claiming th[is] exception," bore "the burden of proving that the exception applies," *Horror Inc. v. Miller*, 15 F.4th 232 (2d Cir. 2021). The district court held that question triable and entered no judgment as to it. A-10485. What remained was only Paramount's unauthorized-use theory under § 103(a).

Agency "is a fiduciary relationship which results from the manifestation of consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act," and the "agent is a party who acts on behalf of the principal with the latter's express, implied, or apparent authority." *Maurillo v. Park Slope U-Haul*, 194 A.D.2d 142, 146 (2d Dep't 1993). Each element is present and undisputed. Paramount manifested its consent in written agreements, engaging Kosinski to direct *Maverick* and oversee the creative development of its screenplay, and engaging Singer to write its screenplay, subject to the studio's control. A-4533-4537; A-4525-4532. It expressly authorized them to develop the film based on the *Top Gun* materials, A-10480, and they consented by executing and performing their agreements.

The agency predicate is not seriously contestable. Paramount is a corporation, and a corporation can act only through its agents; corporations "must act solely through the instrumentality of their officers or other duly authorized agents." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010) (citation omitted). Agency exists here due to Paramount's right to control Kosinski and Singer's work on *Maverick*; Paramount's manifestation in commissioning their development of *Maverick's* screenplay that they act for Paramount, and because, in developing the screenplay, they acted to, and indeed did, benefit Paramount. *See* A-10480; A-2951; A-4537, A-4514; A-4527; A-4535. A principal's "exercise" of the *right* to control

39

"may be very attenuated" and "[s]lavish deference to contractual language is inappropriate in the highly factual and often nuanced agency analysis." *Cleveland*, 448 F.3d at 522-523.

Singer and Kosinski were Paramount's agents for purposes of developing the *Maverick* screenplay. And "the acts of [those] agents, and the knowledge they acquire while acting within the scope of their authority[,] are presumptively imputed to their principal[]"; indeed, "[a] corporation must…be responsible for the acts of its authorized agents *even if particular acts were unauthorized.*" *Kirschner*, 15 N.Y.3d at 465 (emphasis added).

The director of a major motion picture, like Kosinski, has tremendous authority over the creative development of a film, including its screenplay. As Kosinski himself testified, a director is "generally regarded as the primary creative force behind a motion picture" who "oversees its entire artistic production"; that, "[b]roadly speaking," he was "the man in charge"; and that his duties as Maverick's director included close involvement in developing its screenplay, A-5242–A-5243; A-7427, a fact Paramount itself concedes, A-9410.

Indeed, if anything summary judgment should have been granted to Gray based on Singer and Kosinski's depositions. Asked whether he "ever t[old] Gray that any use by Gray of these assigned [*Maverick*] materials or any other Top Gun materials were unauthorized," Singer answered: "Well, of course. He was my

writer's assistant. How -- why would I tell him, on that [sic] the one hand, he's my writer's assistant but he can't break down the assigned materials or do anything with it? That doesn't make sense." Q: "So that's a no, right?" ; A: "Yeah, that's a no." A-5320–A-5321. Asked whether "the film's director, Joe Kosinski, ever t[old] Gray that any use by him of these assigned materials or any other Top Gun materials was unauthorized," Singer responded "No." A-5320. Asked whether Kosinski "ever t[old] Gray that he was infringing Paramount's copyrights by working with Paramount's Top Gun materials," Singer again responded "No"; and asked whether he himself ever told Gray that, Singer responded "Yeah, that's a no." A-5321.

It may have been convenient for their own purposes for Singer and Kosinski to have viewed Gray as an assistant rather than as an author. But what Singer and Kosinski asked Gray to do and what Gray did amount to authorship as a matter of law—a fact assumed by both Paramount and the district court for purposes of summary judgment. A-10484–10485. The *fact* of Gray's *authority* to do those acts amounting to authorship is one Singer freely and repeatedly confirmed. Gray cannot have been authorized when Singer viewed him as a writer's assistant but unauthorized because what Singer asked him to do, and Gray did, amounted to authorship.

The studio's contracts contemplated such collaboration. Each agreement refers to the "Material" Singer and Kosinski were hired to develop "either alone or

41

in collaboration with others". A-2951; A-4537. Singer's Certificate of Authorship

likewise described him as "writing (or collaborating in the writing of) the Work." A-

4530. Whether that language contemplated collaborators of their choosing is, at the

very least, a disputed question of contract meaning—one a court cannot resolve

against Gray on summary judgment. Paramount pointed to and the court relied on a

contrary warranty in Singer's contract that the "Material shall be solely written by

Writer." A-2952. But that is Singer's promise to Paramount giving it a remedy

against Singer: if Singer broke it by enlisting Gray, Paramount's remedy lies against

Singer for breach of warranty. The warranty did not bind the non-signatory Gray,

nor render Gray's invited writing "unlawful," and it sits in obvious tension with the

"in collaboration with others" term of the very same instrument—a conflict for the

jury, not for summary judgment. *Sotomayor*, 713 F.3d at 164.[12]

---

[12] Again, there can be no serious doubt that Singer invited Gray to participate in co-writing the *Maverick* screenplay. On June 4, 2017, Singer asked Gray to "bring u on" to *Top Gun: Maverick*, and Gray agreed. A-5200. The district court itself described this as Singer "ask[ing] [Gray] to join in writing" the screenplay that "Singer submitted to Paramount." A-10481. Gray then "played a significant role in drafting," "participat[ed] in story meetings with Singer and Kosinski," delivered an outline, thereafter wrote scenes as evidenced in time-stamped files and emails, A-7427–7428; A-7435–A-7438, A-10481, which scenes were included by Singer and Kosinski in the screenplay submitted by Singer to Paramount. A-10481. Recordings of sessions additionally show that collaboration in action, with Gray composing the radio dialogue and action beats in scenes alongside Singer and Paramount's Navy consultants who advised them. *See* Statement of the Case C *supra*; Ex. 65, A-5303.

Nor do undisclosed limitations in the principal's own contracts cut off the authority its agents appear to hold: in *Hallock v. State*, 64 N.Y.2d 224 (1984), the agent "accepted the very settlement his clients had instructed him to reject," yet the principal was bound. It fell to the principal's side "to reveal any restrictions" on the agent's authority, and absent disclosure the third party's reliance on the appearance of authority was reasonable. *Id.* at 231-32. Paramount's sole-writer warranty—a term in a contract Gray was not privy to—is precisely such an undisclosed restriction; it cannot defeat the authority Singer's and Kosinski's positions conveyed to a writer who worked *at their invitation*.

"If a principal has given an agent general authority to engage in a class of transactions, *subject to limits known only to the agent and the principal*, third parties may reasonably believe the agent to be authorized to conduct such transactions and need not inquire into the existence of undisclosed limits on the agent's authority. The agent's apparent authority does not disappear when, unbeknownst to the third party, the agent errs in performing tasks requisite to completing a transaction." Restatement (Third) § 3.03 cmt. b. (emphasis added).

Even if there were a dispute as to agency, summary judgment was improper. *See Vista Food Exch., Inc. v. Comercial de Alimentos Sanchez*, 147 F.4th 73 (2d Cir. 2025) (vacating summary judgment where scope of agent's authority was genuinely disputed); *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 (2d Cir. 1994) ("Unless the facts

43

are insufficient to support a finding of agency or there is no dispute as to the historical facts, the question of agency should be submitted to the jury".); *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 290 (2d Cir. 2003) (vacating summary judgment where disputed agency "based on actual or apparent authority" left "material factual disputes."); *Hedeman v. Fairbanks, Morse & Co.*, 286 N.Y. 240, 248–49 (1941) ("[W]here no written authority of the agent has been proven, questions of agency and of its nature and scope…are questions of fact to be submitted to the jury."); *Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 2d 414, 421 (S.D.N.Y. 2007) ("Unless the material facts from which agency is to be inferred are undisputed, the question of agency should be submitted to the jury.").

*Second*, Singer and Kosinski were clothed with apparent authority to involve Gray in the sequel's screenplay development and to permit his use of the *Top Gun* materials in writing scenes for their film. Apparent authority "arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him." *Edward J. Minskoff Equities, Inc. v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996). Crucially, it requires no direct dealing between Paramount and Gray: "apparent authority may arise absent any direct contact between the principal and the third party," and "[t]he

44

appointment of a person to a position with generally recognized duties may create apparent authority." *Prop. Advisory Grp., Inc. v. Bevona*, 718 F. Supp. 209, 211 (S.D.N.Y. 1989). *Bevona*'s rule is this Court's own: "a principal causes his agent to have apparent authority by conduct which, reasonably interpreted, causes third persons to believe that the principal consents to have an act done on his behalf," and "appointment of a person to a position" of authority constitutes such conduct. *First Fidelity Bank, N.A. v. Government of Antigua & Barbuda*, 877 F.2d 189, 193 (2d Cir. 1989). *See also Old Republic Ins. Co. v. Hansa World Cargo Serv.*, 51 F. Supp. 2d 457, 475 (S.D.N.Y. 1999) (Apparent authority "arises when a principal places an agent in a position where it appears the agent has certain powers.") (quotation marks omitted); *U.S. v. Inc. Vill. of Island Park*, 888 F. Supp. 419, 437 (E.D.N.Y. 1995) (emphasizing "authority which outsiders would normally assume…judging from his position").

These principles apply and govern here. Paramount placed Kosinski, its director, and Singer, its screenwriter, in charge of *Maverick*'s creative development and in authorizing them to develop the sequel to *Top Gun*, authorized the use of *Top Gun* elements, A-10480. At their request Gray worked alongside them in story meetings, playing "a significant role in drafting" the script, A-10481. Singer and Kosinski even expressly furnished Gray with the *Top Gun* materials Paramount had assigned to them. A-5291; A-4885.

45

Any person in Gray's position would reasonably understand and believe that the film's director and screenwriter, whom the studio had specifically put in charge of the sequel's screenplay development, were authorized to permit him to use *Top Gun* elements in that endeavor. As referenced above, Gray's understanding and reliance are doubly reasonable as to Kosinski: Paramount employed Kosinski "to serve as Maverick's director in charge of all creative aspects of the Film" and a film's director is widely viewed as the captain of that ship. A-7427.

The district court rejected apparent authority on the sole ground that Gray could identify no word or act by Paramount directed to Gray personally. A-10481, A-10487. But that inverts the doctrine: a principal's objective manifestation may be made through the very position in which it places its agent, and apparent authority "may arise absent any direct contact between the principal and the third party." *Bevona*, 718 F. Supp. at 211; *see First Fidelity Bank, N.A.*, 877 F.2d at 193. Paramount's lack of face-to-face dealing with Gray does not summarily defeat apparent authority.

Again, at the very least, whether Singer and/or Kosinski wielded apparent authority is a question for the jury. "The existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment." *Minskoff*, 98 F.3d at 708; *accord Herbert Constr. Co. v. Continental Ins. Co.*, 931 F.2d 989, 994 (2d Cir. 1991) (whether apparent authority

46

exists turns on factual showings about the principal's conduct and the third party's reliance). So too the question of agency itself: "[w]here the circumstances…raise the possibility of a principal-agent relationship, and no written authority for the agency is established, questions as to the existence and scope of the agency must be submitted to the jury." *Maurillo*, 194 A.D.2d at 146. Whether Singer and Kosinski were Paramount's agents, and whether they were clothed with apparent authority to enlist Gray and permit his use of the *Top Gun* materials, were questions the district court could not resolve against Gray on summary judgment.

**B.    A Reasonable Jury Could Also Find That Gray's Use of *Top Gun* Material Was Permitted by Implied License.**

A copyright owner's license to use its material "may be granted orally, or may even be implied from conduct." *Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998). An implied license turns on the licensor's objective manifestations, not on the licensee's familiarity with the licensor's underlying paperwork. The two inquiries are related but distinct: apparent authority turns on what Gray reasonably believed about Singer's and Kosinski's authority, while an implied license turns on what Paramount's conduct, acting through its agents, objectively manifested—regardless of Gray's knowledge of their contracts. Paramount authorized Singer and Kosinski to develop the sequel and assigned them *Top Gun* materials for that purpose. A-10480. In turn, Singer and Kosinski invited Gray to participate in the writing process and furnished Gray with the *Top Gun* materials. A-5291; A-4885. Under these facts,

the trier of fact could well find an implied license as to Gray's use of such materials. *See Foad Consulting Grp., Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 825–26 (9th Cir. 2001) ("A nonexclusive copyright license may be granted orally or by implication"). And the scope of such permission—written or implied—is measured by its underlying "purpose," here developing an authorized *Top Gun* sequel. *See Gilliam v. American Broadcasting Cos.*, 538 F.2d 14, 20 (2d Cir. 1976); *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008) (implied-license scope turns on objective intent). A jury crediting Gray's account could find that his use of *Top Gun* at the requests and under the supervision of its sequel's director and screenwriter was permitted, and not unlawful.

*     *     *

As shown above, lawful use presents a clear jury question through three independent paths, and Paramount has no other defense to Gray's claim. "Copyright…vests initially in the author," 17 U.S.C. § 201(a), and is displaced only by a work-for-hire relationship or by an "instrument of conveyance," *id*, § 204(a), neither of which exists here. Furthermore, the district court held any work-for-hire issue triable and entered no judgment on it. A-10485. Drawing every inference in Gray's favor, the copyright in his original expressive material remained his. *Schrock* confirms that a derivative author "own[s] the copyright" in his "incremental original expression," "by operation of law," 586 F.3d at 518, 524. Paramount's only

48

rejoinder—that Gray's use was unlawful—returns the analysis to disputed agency and actual or apparent authority questions; and even if those jury questions were resolved against Gray, § 103(a) would forfeit no more than those parts of the Gray Scenes containing protectable *Top Gun* material, preserving Gray's substantial contributions under § 103(b). *See* Argument I, *supra*.

Whether the course of dealing of the participants conferred actual or apparent authority, or an implied license, or, in any event, left Gray the author of his own lawful contributions under § 103(b) are overlapping questions of fact for a jury. On Paramount's summary judgment motion, the district court drew all inferences against Gray as to these triable issues. That is reversible error. *Liberty Lobby*, 477 U.S. at 248–49.

### III. THE DISTRICT COURT ERRED IN DISMISSING GRAY'S JOINT AUTHORSHIP AND ACCOUNTING CLAIMS WITH PREJUDICE ON THE PLEADINGS.

Gray pleaded his joint-authorship claim "in the alternative" to his copyright-infringement claim. A-33. The district court dismissed Gray's joint-authorship and accounting claims at the outset, with prejudice and without leave to amend. A-1075; A-1084. In so doing, the court resolved a fact-laden intent inquiry against Gray on the pleadings, weighed competing inferences in Paramount's favor, and foreclosed amendment without identifying anything incurable. That ruling cannot be reconciled with the Rule 12(b)(6) standard which mandates reversal.

A.   The Court Accepted Gray's Independently Copyrightable Contributions, so Dismissal Turned Entirely on Mutual Intent.

"A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. In this Circuit, "[a] co-authorship claimant bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." *Thomson*, 147 F.3d at 200. The district court held that "Gray has sufficiently alleged that he made independently copyrightable contributions to the Film and its screenplay." A-1070. Its dismissal rested on mutual intent to be co-authors, which the court held Gray failed to plausibly allege. A-1075. Mutual intent, however, is a question the district court was not free to answer against Gray on a motion to dismiss.

The first prong, independent copyrightability, guards against treating trivial contributions as authorship. A-1070. The second, mutual intent, is the element *Childress* and *Thomson* designed to be assessed on a developed record, through "factual indicia." *Thomson*, 147 F.3d at 200–01. Compressing that contextual factual inquiry into a pleading checklist, and then resolving each item against the pleader, is faithful to neither decision nor the standards governing motions to dismiss. *See Lynch*, 952 F.3d at 74–75.

50

**B.** **Mutual Intent Is a Fact-Intensive, Contextual Inquiry, Ill-Suited for Resolution on a Rule 12(b)(6) Motion.**

The mutual-intent requirement exists to "guard against the risk that *a sole author* is denied exclusive authorship status simply because another person rendered some form of assistance." *Childress v. Taylor*, 945 F.2d 500, 507–09 (2d Cir. 1991) (emphasis added) (concerning a play's playwright vs. its actress). By contrast here, Gray "sufficiently alleged" that, at Singer's request, he wrote fifteen key scenes or sequences, backed by time-stamped files, comprising the most memorable major action sequences in *Maverick*. A-1069–1070, A-6938.

Furthermore, "[w]hat distinguishes the writer-editor relationship and the writer-researcher relationship from the true joint author relationship is the lack of intent of both participants…to regard themselves as joint authors." *Thomson*, 147 F.3d at 200–01 (concerning a play's playwright/composer vs. a theater consultant). But that inquiry is neither mechanical nor suited to resolution on the pleadings. It is, of course, "not strictly subjective"; it proceeds through "factual indicia" of authorship. *Thomson*, 147 F.3d at 200–01. "An important indicator of authorship is a contributor's decisionmaking authority over what changes are made and what is included in a work." *Id.* at 202–03. The determination "requires a sensitive accommodation of competing demands advanced by at least two persons." *Childress*, 945 F.2d at 507–09.

51

That fact-intensive inquiry is for the factfinder. *See Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 110 (2d Cir. 2002) ("Authorship is generally a question of fact for the jury."). On a Rule 12(b)(6) motion the court must "accept well pleaded factual assertions as true" and "draw all reasonable factual inferences in favor of the plaintiff." *Lynch*, 952 F.3d at 74–75. *Thomson* itself was decided only after a bench trial, and *Childress* was decided on summary judgment after full factual development. To resolve each disputed factor against a plaintiff is to convert a trial standard into a pleading bar. That is error.

The line *Childress* drew ran between "the writer-editor relationship and the writer-researcher relationship," on the one hand, and "the true joint author relationship," on the other, and it located that line in "the lack of intent of both participants…to regard themselves as joint authors." 945 F.2d at 507–09. Gray alleged that Singer invited him to write, that the two wrote together for months alongside the director, with the intent that Gray's significant scenes be merged into the unitary screenplay Singer delivered to Paramount, as in fact happened. A-27–A-31; *see* 17 U.S.C. § 101 ("[A] work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."). Those allegations place Gray firmly on the co-author side of the *Childress* line, or at minimum raise questions that cannot be resolved against Gray on the pleadings. The district court resolved it all against Gray anyway,

52

ignoring Singer and Gray's obvious intent that their written material "be merged into…a unitary whole." *Id*., A-1075.

### C. The Court Resolved Disputed Indicia Against Gray and Demanded Proof the Pleadings Need Not Supply.

The district court dismissed because, in its view, Paramount's control over the final film, the absence of a Gray-Paramount contract and Gray credit, pointed away from mutual intent. On Paramount's motion, the court weighed all of the above against the pleader, drawing all inferences in favor of Paramount rather than Gray. A-1075.

Singer and Kosinski invited Gray to write; Gray worked for months with Singer and Kosinski in developing a *unitary screenplay* for submission to Paramount; Gray wrote key scenes that were merged into the screenplay Singer then submitted to Paramount, with Kosinski's knowledge and participation. A-24-30. Gray had no control over Paramount's derivative *film*, its billing and credit, or registrations, all of which reflect the hierarchical imbalance between writers and Hollywood studios, not Gray's actual co-authorship of the *screenplay*. *Childress* makes the point: "billing" or "credit" "is not decisive…joint authorship can exist without any explicit discussion of th[at] topic." 945 F.2d at 507–09. Control "over what changes are made and what is included in a work," *Thomson*, 147 F.3d at 202–03, may bear on dominance, but the Complaint alleges that "Gray himself wrote key scenes for the screenplay," A-24, and that he "superintended his work by exercising

53

creative control over separate and indispensable elements of the Screenplay." A-30. Finally, the absence of a Gray–Paramount contract cuts for Gray as readily as against him, as no work-for-hire agreement or assignment displaced his authorship rights. These all present competing inferences for trial, and at the pleading stage the court was obliged to draw them in Gray's favor.

Joint authorship is a question of creation, and it runs between the people who created the work: here, Gray and Singer. The Act's definition of a joint work "concerns the creation of the work by the joint authors, not the circumstances…under which a work may be jointly owned." *Childress*, 945 F.2d at 505; *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266, 267 (2d Cir. 1944) (L. Hand, J.) ("[I]t is enough that the [co-authors] mean their contributions to be complementary in the sense that they are to be embodied in a single work to be performed as such."); *Weissmann*, 868 F.2d at 1318 ("each must intend to contribute to a joint work at the time his or her alleged contribution is made").[13] The requisite intent to be a co-author is objective, not "subjective," and it "does not turn solely on the parties' own words or professed state of mind." *Thomson,* 147 F.3d at 201.

---

[13] The *Childress/Thomson* test, developed to deal with marginal contributors, e.g., an actress or consultant, has migrated from those fringe factual scenarios to obfuscate traditional, obvious co-authorship scenarios, present here. In light of that and other criticisms, *Beard v. Helman*, 722 F. Supp. 3d 521, 549-52 (M.D. Pa. 2024), the Court should consider *en banc* review to correct drifting precedent.

54

The statute asks whether the writers intended that their contributions "be merged into inseparable or interdependent parts of a unitary whole," here the *Maverick* screenplay. *Childress*, 945 F.2d at 505. *See Kaplan v. Vincent*, 937 F. Supp. 307, 314–15 (S.D.N.Y. 1996) (the statutory wording "appears to make relevant only the state of mind regarding the unitary nature of the finished work." (citing *Childress*, 945 F.2d at 507)).

The district court faulted Gray for not pleading that "Singer or Kosinski bound PPC…via actual or apparent authority." A-1075. *First*, Gray pleaded exactly that: "[Singer and Kosinski] represented themselves to Gray as having the authority and the approval of PPC and/or had the apparent authority of PPC to involve Gray in the project," and "acted, with respect to Gray, as PPC's employees and/or agents acting within the scope of such employment and/or agency." A-27-28.

*Second*, authority to bind the relevant publisher or studio to a *co-ownership* relationship is not on the list of co-authorship indicia, nor could it be. Ownership may often follow authorship, but they are fundamentally distinct issues—one concerning rights to exploit a work and the other concerning its *creation*.

Paramount's interest does not change the analysis, because it is wholly derivative. Paramount did not write the screenplay; it succeeds to Singer's rights under a loan-out agreement providing that his work shall be owned by Paramount as work-for-hire and, if not, assigning his rights to Paramount. A-4530; A-4532.

55

Paramount thus holds only what Singer would hold: either as his employer or his assignee. *See Davis v. Blige*, 505 F.3d at 99, 104 (2d Cir. 2007). Whether Singer and Kosinski could "bind" Paramount is beside the point in evaluating Gray's co-authorship of the screenplay *with Singer*.

Even if agency and/or authority bore on the inquiry, it could not be resolved against Gray on the pleadings. As discussed above, an agent's authority or apparent authority is a fact-bound question, and "[s]lavish deference to contractual language is inappropriate in the highly-factual and often nuanced agency analysis." *Cleveland*, 448 F.3d at 523 (vacating judgment on the pleadings that rested on contractual labels). The district court nonetheless resolved the authority question on the pleadings, crediting Paramount's preferred reading over the competing inferences Rule 12 owed Gray. A-1075.

Paramount also leaned heavily below on *Casa Duse*, arguing that the Gray Scenes are not copyrightable because they were "merged" into the film. 791 F.3d 247. That decision does not authorize Rule 12 dismissal here. *Casa Duse* denied, after discovery, on a fully developed record, ownership of a *film* by its *director*. 791 F.3d at 255-56. The case has no application to co-authors of a screenplay. The district court itself recognized that *Casa Duse* had no application here, holding with regard to Gray's infringement claim that "this case…[is] readily distinguishable from *Casa Duse*." A-1080.

### D. Dismissal With Prejudice and Denial of a First Chance to Amend Were Error.

Even if the Complaint were deficient, dismissal *with prejudice* was not the answer. Rule 15(a)(2) directs that courts "should freely give leave [to amend] when justice so requires," and this Court has emphasized that "the permissive standard of Rule 15 is consistent with our strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (internal quotation marks omitted).

The district court denied leave in a footnote, stating that "[a]t oral argument," Gray's "counsel was unable to proffer any facts," so amendment "would be futile." A-1075 n.6. Counsel allegedly not reciting facts on the spot at oral argument is not a proper basis to foreclose amendment with prejudice. In any event, the record refutes this: Gray's counsel proffered that Singer and Kosinski *invited* Gray to co-write the screenplay, held extensive story meetings with Gray, read and praised his scenes, and incorporated them into the screenplay, A-1037. The court concluded that only an express allegation that Singer and Kosinski told Gray "we want you to be joint author" would suffice (A-1044)—a showing co-authorship has never required, and one foreclosed by the court's own recognition that "circumstantial evidence" can "supply the necessary proof of mutual assent." A-1044. Moreover, it is well settled that "joint authorship can exist without any explicit discussion of this topic by the parties." *Childress*, 945 F.2d at 508.

57

*Loreley* is directly on point. A district court "exceed[s] the bounds of its discretion in denying [a plaintiff] leave to amend," *id.* at 189, where it forecloses repleading "[w]ithout the benefit of a ruling" identifying the specific deficiency and a reason amendment cannot cure it. *Id.* at 190. So too here.

## CONCLUSION

Gray's joint authorship and infringement claims are pleaded in the alternative, and either way his expression is his. If the Screenplay is a joint work, Gray is a co-author entitled to his undivided share of profits and an accounting as addressed in Argument III. A-31. If not, his registered expressive scenes support an infringement claim as addressed in Arguments I and II. A-33. What Gray's fixed copyright-protected expression cannot be is what the district court made it: free for Paramount's taking and extensive exploitation.

This Court should reverse the judgment, reinstate Gray's copyright-infringement claim, and reverse the dismissal of his joint-authorship claim. Reversal of either claim would also revive the derivative accounting claim.

Dated: June 23, 2026.                    Respectfully submitted,

                                          /s/  Marc Toberoff
                                          Marc Toberoff
                                          TOBEROFF & ASSOCIATES, P.C.
                                          23823 Malibu Road, Suite 50-363
                                          Malibu, California 90265

                                          *Counsel for Plaintiff-Appellant Shaun Gray*

58

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) and Second Circuit Local Rule 32.1(a)(4). Excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), it contains 13,992 words. This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated:  June 23, 2026.                     /s/   *Marc Toberoff*
                                           Marc Toberoff

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the date set forth below, the foregoing brief was filed with the Clerk of the Court using the CM/ECF system, which will serve a notice of electronic filing on all counsel of record.

Dated:  June 23, 2026.             */s/   Marc Toberoff*
                                      Marc Toberoff