# 26-0605-cv

## United States Court of Appeals

*for the*

## Second Circuit

SHAUN GRAY,

*Plaintiff-Counter-Defendant-Appellant,*

– v. –

PARAMOUNT GLOBAL, a Delaware corporation, PARAMOUNT PICTURES CORPORATION, a Delaware corporation, PARAMOUNT STREAMING SERVICES INC., a Delaware corporation,

*Defendants-Counter-Claimants-Appellees,*

DOES, 1 THROUGH 10,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**PAGE PROOF BRIEF FOR DEFENDANTS-COUNTER-CLAIMANTS-APPELLEES**

ANTON METLITSKY
O'MELVENY & MYERS LLP
1301 Avenue of the Americas,
Suite 1700
New York, New York 10019
(212) 326-2000

MOLLY M. LENS
F. CODY KAHOE
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
(310) 553-6700

*Attorneys for Defendants-Counter-Claimants-Appellees*

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (716213)

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellees make the following disclosure: Paramount Pictures Corporation and Paramount Streaming Services, Inc. are wholly owned subsidiaries of Paramount Global. Paramount Global is a wholly owned subsidiary of Paramount Skydance Corporation (PSKY), a publicly traded company.

Date: September 22, 2026

Respectfully submitted,

O'MELVENY & MYERS LLP

By: /s/ Molly M. Lens
Molly M. Lens
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
mlens@omm.com

*Attorney for Defendants-Appellees Paramount Global, Paramount Pictures Corporation, and Paramount Streaming Services, Inc.*

# TABLE OF CONTENTS


**Page**

CORPORATE DISCLOSURE STATEMENT ....... i

INTRODUCTION ....... 1

JURISDICTIONAL STATEMENT ....... 5

STATEMENT OF ISSUES ....... 5

STATEMENT OF THE CASE ....... 5

A. Factual Background ....... 5

B. Procedural Background ....... 9

1. Complaint ....... 9

2. District Court Dismisses the Joint Authorship Claim ....... 9

3. District Court Grants Paramount Summary Judgment On Copyright Infringement Claim ....... 10

SUMMARY OF THE ARGUMENT ....... 11

ARGUMENT ....... 15

I. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO PARAMOUNT ON GRAY'S COPYRIGHT INFRINGEMENT CLAIM ....... 15

A. The Gray Scenes Are Unprotected Infringing Works, As The District Court Correctly Held. ....... 15

1. Copyright is unavailable for unauthorized derivative works ....... 16

2. The Gray Scenes are an unauthorized derivative work pervaded by the original Top Gun ....... 19

3. Gray was not authorized to use Paramount's copyrighted material to make the Gray Scenes ....... 29

B. Gray's Infringement Claim Is Barred By Equitable Estoppel. ....... 37

1. Gray had knowledge of Paramount's allegedly infringing conduct. ....... 38

2. Gray acted in a manner that gave Paramount a right to believe it could use the "Gray Scenes." ....... 39

3. Paramount was ignorant of the true facts ....... 41

**TABLE OF CONTENTS**
**(continued)**

**Page**


4. Paramount relied on Gray's conduct to its detriment. ............44

C. The Gray Scenes Are Not Independently Copyrightable Works. ......45

II. THE DISTRICT COURT CORRECTLY DISMISSED GRAY'S JOINT AUTHORSHIP CLAIM ........48

A. Gray Did Not Plausibly Plead Mutual Intent To Be Co-Authors ......49

1. Decisionmaking authority ........50

2. Billing ........52

3. Written agreements with third parties ........53

B. Gray's Contrary Arguments Are Meritless ........54

CONCLUSION ........58

CERTIFICATE OF COMPLIANCE ........60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*16 Casa Duse, LLC v. Merkin*,
791 F.3d 247 (2d Cir. 2015) .......... passim

*Aalmuhammed v. Lee*,
202 F.3d 1227 (9th Cir. 2000) .......... 51, 54

*ABKCO Music, Inc. v. Sagan*,
50 F.4th 309 (2d Cir. 2022) .......... 38

*Anderson v. Stallone*,
1989 WL 206431 (C.D. Cal. Apr. 25, 1989) .......... 11, 29

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .......... 16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 56

*Atticus Limited Liability Co. v. Dramatic Publ'g Co.*,
145 F.4th 257 (2d Cir. 2025) .......... 17, 26

*Bank of China v. NBM LLC*,
359 F.3d 171 (2d Cir. 2004) .......... 42

*Bank of N.Y. v. First Millenium, Inc.*,
607 F.3d 905 (2d Cir. 2010) .......... 15

*Bd. of Educ. of Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley*,
539 N.Y.S.2d 814 (App. Div. 1989) .......... 44

*Bellin v. Zucker*,
6 F.4th 463 (2d Cir. 2021) .......... 15

*Carson v. Dynegy, Inc.*,
344 F.3d 446 (5th Cir. 2003) .......... 43

*Childress v. Taylor*,
945 F.2d 500 (2d Cir. 1991) .......... 49

*Dam Things from Denmark, a/k/a Troll Company ApS, v. Russ Berrie & Co.*,
290 F.3d 548 (3d Cir. 2002) .......... 18

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Detective Comics v. Bruns Publ'ns*,
111 F.2d 432 (2d Cir. 1940) .......... 21

*Eden Toys, Inc. v. Florelee Undergarment Co.*,
697 F.2d 27 (2d Cir. 1982) .......... 19, 25

*F.D.I.C. v. Providence College*,
115 F.3d 136 (2d Cir. 1997) .......... 37

*Feist Publ'ns, Inc. v. Rural Telephone Serv. Co.*,
499 U.S. 340 (1991) .......... 22

*First Fid. Bank, N.A. v. Gov't of Antigua & Barbuda*,
877 F.2d 189 (2d Cir. 1989) .......... 34

*Fletcher v. Atex, Inc.*,
68 F.3d 1451 (2d Cir. 1995) .......... 34

*Ford v. Unity Hosp.*,
32 N.Y.2d 464 (1973) .......... 31

*G. Ricordi & Co. v. Paramount Pictures, Inc.*,
189 F.2d 469 (2d Cir. 1951) .......... 26

*Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*,
697 F.3d 59 (2d Cir. 2012) .......... 35

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) .......... 47

*Highland Cap. Mgmt. LP v. Schneider*,
607 F.3d 322 (2d Cir. 2010) .......... 31, 33, 35

*Hiller, LLC v. Success Grp. Int'l Learning Alliance, LLC*,
976 F.3d 620 (6th Cir. 2020) .......... passim

*Horoshko v. Citibank, N.A.*,
373 F.3d 248 (2d Cir. 2004) .......... 57

*Keeling v. Hars*,
809 F.3d 43 (2d Cir. 2015) .......... passim

*Kirschner v. KPMG LLP*,
15 N.Y.3d 446 (2010) .......... 42

*Mulcahy v. Cheetah Learning LLC*,
386 F.3d 849 (8th Cir. 2004) .......... 19

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Mut. Life Ins. Co. of N.Y. v. Hilton-Green*,
241 U.S. 613 (1916) ....................................................................................44

*Nat'l Union of Hosp. & Health Care Emps. v. Carey*,
557 F.2d 278 (2d Cir. 1977) ........................................................................58

*Palladium Music, Inc. v. EatSleepMusic, Inc.*,
398 F.3d 1193 (10th Cir. 2005) ...................................................................19

*Pickett v. Prince*,
207 F.3d 402 (7th Cir. 2000) ................................................................ passim

*Polychron v. Bezos*,
2023 WL 6192743 (C.D. Cal. Aug. 14, 2023) ..............................................29

*Radwan v. Manuel*,
55 F.4th 101 (2d Cir. 2022) .........................................................................57

*Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*,
531 F.3d 962 (9th Cir. 2008) .................................................................. 51, 52

*Schwebel v. Crandall*,
967 F.3d 96 (2d Cir. 2020) ..........................................................................38

*Silverman v. CBS Inc.*,
870 F.2d 40 (2d Cir. 1989) ..................................................................... 17, 26

*Simon v. Safelite Glass Corp.*,
128 F.3d 68 (2d Cir. 1997) ..........................................................................22

*Slate v. Am. Broad. Companies, Inc.*,
941 F. Supp. 2d 27 (D.D.C. 2013), *aff'd*, 584 F. App'x 2 (D.C. Cir.
2014) ............................................................................................................43

*Slattery v. Hochul*,
61 F.4th 278 (2d Cir. 2023) .........................................................................37

*Thomson v. Larson*,
147 F.3d 195 (2d Cir. 1998) ................................................................ passim

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*,
692 F.3d 1009 (9th Cir. 2012) .....................................................................19

*Warner Bros. Inc. v. Am. Broad. Companies, Inc.*,
720 F.2d 231 (2d Cir. 1983) ........................................................................21

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Weissmann v. Freeman*,
868 F.2d 1313 (2d Cir. 1989) ....................26

*Wight v. BankAmerica Corp.*,
219 F.3d 79 (2d Cir. 2000) ....................42

*Williams v. Citigroup Inc.*,
659 F.3d 208 (2d Cir. 2011) ....................57

*Wilson v. Merrill Lynch & Co.*,
671 F.3d 120 (2d Cir. 2011) ....................58

*Wozniak v. Warner Bros. Ent. Inc.*,
726 F. Supp. 3d 213 (S.D.N.Y. 2024) .................... 20, 29

*Yonay v. Paramount Pictures Corp.*,
163 F.4th 685 (9th Cir. 2026) ....................22

**Statutes**

17 U.S.C. § 101 .................... passim

17 U.S.C. § 102 ....................45

17 U.S.C. § 102(a) ....................16

17 U.S.C. § 103(a) .................... passim

17 U.S.C. § 103(b) ....................17

17 U.S.C. § 106 ....................22

17 U.S.C. § 106(2) .................... 1, 12, 16, 24

17 U.S.C. § 201(b) ....................55

**Other Authorities**

C.J.S. Agency (2026) ....................31

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 57 (1976).................... 18, 26, 27

Melville B. Nimmer & David Nimmer, Nimmer on Copyright (2026) ....................25

N.Y. Jur. 2d Agency (2026)....................43

N.Y. Prac., Com. Litig. in New York State Courts (5th ed. 2026)....................43

Paul Goldstein, Goldstein on Copyright (3d ed. 2026) ....................25

Restatement (Third) Of Agency (2006).................... 34, 35, 43

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

William F. Patry, Patry on Copyright (2026) .............................................. 17, 18, 25

## INTRODUCTION

Defendant-Appellee Paramount Pictures Corporation is the creator and owner of *Top Gun*, the hit 1986 movie that famously features Navy pilots — including Lieutenants Pete "Maverick" Mitchell and Nick "Goose" Bradshaw—as they train at the U.S. Navy's Fighter Weapons School. In 2011, Paramount began to develop a sequel to *Top Gun,* ultimately called *Top Gun: Maverick*, which would pick up on the original story and would include Maverick, as well as Goose's son, as lead characters. All agree that *Maverick* is a "derivative work" based on *Top Gun*. Under the Copyright Act, Paramount has the "exclusive" right to create such a work. 17 U.S.C. § 106(2).

As is customary, Paramount worked with numerous collaborators (including screenwriters) to create *Maverick*. As is also customary, every one of those collaborators signed a work-made-for-hire agreement, meaning that Paramount would be the author and owner of *Maverick*. Paramount was, in other words, exceedingly careful to retain control and ownership over the characters and story it first developed in *Top Gun* and would expand in *Maverick*.

The plaintiff here, Shaun Gray, is *not* one of those screenwriters whom Paramount authorized to help adapt *Top Gun*. Instead, Gray contends that he secretly ghost-wrote portions of the work of one of Paramount's work-made-for-hire screenwriters—Gray's cousin, Eric Singer, who received screenwriting credit

on *Maverick*. Gray also contends that he passed off his work as Singer's writing, while intentionally concealing his own purported role from Paramount. Gray's incredible claim is that, as a result of that scheme, he—unlike all the individuals whom Paramount actually authorized to work on *Maverick*—owns all or part of the copyright in *Maverick*, and that Paramount has infringed *his* copyright.

According to Gray, he worked with Singer and wrote several scenes (the "Gray Scenes") that he claims were later used in the movie, almost all of which center on the iconic Maverick character. But Gray does not allege that Paramount agreed to collaborate and share its intellectual property with him. To the contrary, Gray admits that he and Singer *hid Gray's purported role from Paramount* because they believed that Paramount would not allow Gray to work on *Maverick*, or at least that it would pay him and Singer less than Singer working alone. Instead, the plan, in Gray's words, was to ask "forgiveness [rather] than permission," and to spring Gray's alleged role on Paramount sometime after they completed their screenwriting.

But Gray never did ask forgiveness, or inform Paramount of his purported contributions to Singer's draft. Instead, he remained silent for years, as Singer's draft was submitted to Paramount (with Singer, but not Gray, listed as an author), as Paramount spent hundreds of millions of dollars developing, producing and releasing the film, and as Singer was granted a screenwriting credit by the Writer's

Guild of America—all with Gray's knowledge. It was not until over five years had passed, and *Maverick*'s theatrical run was complete, that Gray informed Paramount of his supposed role. And then, rather than sue Singer for breaching his alleged agreement with Gray, Gray sued *Paramount*, arguing that—unlike any of the *authorized* collaborators who worked on *Maverick*—he either owned a copyright in his purported contributions to the film, or in the alternative, jointly owned with Paramount a copyright in the entire film.

The district court quite rightly dismissed Gray's joint authorship claim on the pleadings for lack of any plausible allegation that Paramount intended Gray to be a joint author. That conclusion is obvious. Again, Gray hid his purported role, so Paramount could hardly have intended to be his joint author—particularly when Paramount carefully ensured in its agreements with known collaborators that Paramount would remain the sole author of the work.

The district court allowed discovery into Gray's claim that *Maverick* infringed his alleged copyright in the Gray Scenes, but granted summary judgment to Paramount. Unsurprisingly, the implausible nature of Gray's claim means that there is more than one doctrinal reason to reject it. The district court relied on only one, but this Court can choose from several.

First, as the district court correctly held, the Gray Scenes are not entitled to copyright protection—full stop. Unauthorized derivative works, like the Gray

Scenes, are not copyrightable because they "unlawfully infringe the exclusive rights of the original author" to create derivative works. *Keeling v. Hars*, 809 F.3d 43, 48 (2d Cir. 2015). Gray's argument that some "parts" of the Gray Scenes might nevertheless be protected both misunderstands the Copyright Act and, in any case, makes no sense here, where the protected characters and other elements from *Top Gun* indisputably pervade Gray's scenes.

Second, and alternatively, Gray is equitably estopped from suing Paramount for infringement. By his own account, he hid his purported contributions to *Maverick* from Paramount for years, precisely to lure Paramount into using his material and then to extract a higher fee once it did so. That is a textbook case for estoppel.

Third, and again alternatively, the Gray Scenes are not independently copyrightable works. The Copyright Act protects "works of authorship" (like a screenplay), not the constituent parts of such a work (like individual scenes in a screenplay) that cannot and were never intended to stand on their own. *See 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247 (2d Cir. 2015).

For these reasons, and as described below, the judgment below should be affirmed.

## JURISDICTIONAL STATEMENT

Gray's jurisdictional statement is correct, except for footnote 1.

## STATEMENT OF ISSUES

1. Whether the district court correctly held that copyright protection does not extend to the Gray Scenes because they are unauthorized derivative works.

2. Whether Gray is equitably estopped from asserting any copyright infringement claim against Paramount.

3. Whether copyright protection does not extend to the Gray Scenes because they are not independently copyrightable works.

4. Whether the district court correctly dismissed Gray's joint authorship claim.

## STATEMENT OF THE CASE

### A. Factual Background

In May 2022, Paramount released its blockbuster film *Top Gun: Maverick*. *Maverick* was the long-awaited sequel to its 1986 film *Top Gun*, which followed the journey of a group of young F-14 Tomcat fighter pilots, particularly the characters of Pete "Maverick" Mitchell, portrayed by Tom Cruise, and his close friend and intercept officer, Nick "Goose" Bradshaw, who tragically dies during a training accident. Dist. Ct. Dkt. ("Dkt.") 111 ¶ 1. Starting in 2011, Paramount hired a director, Joseph Kosinski, and five consecutive "work-made-for-hire" screenwriters to work on developing *Maverick*, meaning that their contracts

(including Kosinski's) provided that Paramount would be the author and owner of the material they produced. *Id.* ¶¶ 3-11. Sandwiched in the middle was writer Eric Singer, whose final screenplay draft was submitted to Paramount on November 3, 2017 ("Singer Draft"). *Id.* ¶¶ 9-11. Years later, Plaintiff Shaun Gray—Singer's cousin—claimed that he secretly ghost-wrote fifteen "Gray Scenes" for the Singer Draft and that *Maverick* infringes his copyright in them. *Id.* ¶ 19.

Many of the most crucial facts here are Gray's own words. In January 2023, Gray sent Paramount a written statement detailing a secret side deal he allegedly reached with Singer in 2017 to co-write the Singer Draft and hide that purported writing role from Paramount.[1] *Id.* ¶¶ 20-30. Even before Singer had a deal with Paramount, Gray says that Singer asked Gray "to develop and write the screenplay for 'Top Gun: Maverick' with him as a writing team." *Id.* ¶ 21. But they opted not to ask "the Studio to contract us as a writing team," because "it risked blowing up the deal and could cause us to lose the project entirely." *Id.* ¶¶ 22-24. Gray says that Singer "proposed that he negotiate the initial contract as an individual writer and said that after the script was written, he would reapproach the Studio and Producers to 'set the record straight,'" to which Gray agreed. *Id.* ¶¶ 24-25. The

[1] The facts here are based on Gray's own narrative (which he testified was an accurate account of this case, Dkt. 84-64 at 36-40), since those facts must be construed in his favor on the pleadings and at summary judgment. To be clear, however, Paramount vehemently disputes the truth of Gray's narrative, including his ostensible writing role.

thought was that "by delay[ing] notifying the Studio or producers of [Gray's] involvement," they "could ensure that we secured the chance to write the movie" and also serve "both of our financial interests" because Gray's "lack of prior writing credits would cause the size of that deal to be greatly reduced as compared to the rate [Singer] was able to command." *Id.* ¶ 26. On his own, Singer could "negotiate a better deal" and get from Paramount "more money…for both of us." *Id.* ¶ 27. So they resolved to "ask forgiveness [rather] than permission." *Id.* ¶ 23.

Gray claims that he thus entered into "a good faith verbal agreement" with Singer to help write a screen-play for *Maverick*, in which Singer "guaranteed [Gray] would be credited for [his] writing and paid the lesser portion of a 60/40 split" of Singer's back-end compensation. *Id.* ¶ 28. Meanwhile, Singer entered into a contract with Paramount to write a screenplay for *Maverick* as an individual writer, representing and warranting to Paramount that his draft would be "solely written by [Singer]" and "wholly original with [Singer]." *Id.* ¶ 9-11.

Gray says he had a further conversation with Singer "[i]n late October 2017, as we neared completion of the first draft of 'Top Gun: Maverick,'" at which point Gray "believed it was time to notify the Studio and put both of our names on the script." *Id.* ¶ 31. According to Gray, Singer said "it wasn't the right time" and "it could potentially blow up the movie or get our chance to do the rewrites taken away." *Id.* ¶ 32. So the Singer Draft was submitted to Paramount under Singer's

name (alongside Paramount's prior work-for-hire writers, Peter Craig and Justin Marks), with Gray's name nowhere to be found. *Id.* ¶¶ 33-36.

Gray says he broached the topic with Singer again in 2019, as Singer "had still not informed the Studio of [Gray's] co-writing role." *Id.* ¶ 38. With the "'Top Gun' WGA [Writers Guild] credit arbitration … soon to get underway," *id.* ¶ 39, Gray told Singer "it was the opportune time for him to inform everyone that [Gray] had actually co-written the script with him," *id.* ¶ 40. Yet, while Gray "had growing doubts that [Singer] held any intentions to ever notify the Guild and Studio that [Gray] was his co-writer," *id.* ¶ 42, Gray still said nothing to the WGA or to Paramount. *Id.* ¶ 43. The WGA determined Singer and four other writers—not Gray—should receive a credit. *Id.* ¶¶ 44-45.

Gray hid his purported role from Paramount for over five years, as Paramount spent hundreds of millions of dollars developing, producing, and releasing *Maverick*. *Id.* ¶¶ 46-47. Gray said nothing to Paramount as Singer entered into a solo writing contract with Paramount, as Gray allegedly wrote scenes for the Singer Draft, as the Singer Draft was submitted to Paramount under Singer's name with no mention of Gray, as Paramount shared the Singer Draft with the next screenwriters, as Gray (through counsel) negotiated a contract with Paramount to write for a separate Paramount television series, as Gray saw a trailer for *Maverick* featuring content he claimed to have written, as the WGA conducted

the credit arbitration, as Paramount produced and released *Maverick*, as Gray watched *Maverick* in theaters, and as *Maverick* completed its theatrical run. *Id.* ¶ 48. It was not until seven months after *Maverick*'s release that Gray sent his statement to Paramount, informing the Studio of his purported role.

## B. Procedural Background

### 1. *Complaint*

Rather than sue Singer for breach of contract, Gray instead applied to the Copyright Office to register the Gray Scenes and then sued Paramount. In his complaint, Gray asserted two theories: (1) that unlike the screenwriters whom Paramount actually hired, all under work-made-for-hire agreements, Gray was *Maverick*'s co-author alongside Paramount, and thus the final screenplay and movie are "joint works" under federal copyright law in which he and Paramount share an undivided interest, including in all profits; and, alternatively, (2) that by producing and releasing *Maverick*, Paramount had infringed Gray's copyright in the "Gray Scenes," which he alleged were substantially similar to scenes in the film. Dkt. 1 ¶¶ 38-78.

### 2. *District Court Dismisses the Joint Authorship Claim*

The district court dismissed Gray's joint authorship claim under Rule 12(b)(6). SPA-1-2, 8-15. The court concluded that Gray's complaint failed to allege that he and Paramount shared "a mutual intent to be co-authors." SPA-10. Applying the test for mutual intent set forth in *Thomson v. Larson*, 147 F.3d 195

(2d Cir. 1998), the court found that Gray did not allege any decisionmaking authority or editorial control over the final *Maverick* screenplay, let alone the film itself. SPA-12-13. Gray was not billed or credited in the screenplay or film at all. SPA-12. Moreover, as the complaint alleged, Paramount had entered into work-made-for-hire contracts with every authorized collaborator, demonstrating that Paramount "did not intend to share authorship with any individual, including Gray." SPA-13-14. "[A]ny finding to the contrary would suggest that Gray was the *only* writer [Paramount] sought to make a joint author and owner. Such an allegation is implausible on its face." SPA-14.

### 3. *District Court Grants Paramount Summary Judgment On Copyright Infringement Claim*

After discovery on Gray's copyright infringement claim, Paramount moved for summary judgment. Dkt. 76. Paramount's motion raised several grounds, *see infra* at 15, but the district court needed to reach only one to grant summary judgment—namely, that the Gray Scenes were, themselves, unauthorized derivative works of *Top Gun* and "*cannot* be copyrighted." SPA-31.

Specifically, the district court found that there was no genuine dispute that Paramount owned the copyright to *Top Gun*, and that the "Gray Scenes," as an intentional sequel to *Top Gun*, were "materially based on the *Top Gun* universe," including its "characters, settings, and plot devices." SPA-32. The "Gray Scenes," the court explained, "represent[ed] Gray's re-capturing of the *Top Gun* universe in

ways that entirely pervade his scenes," including the original film's main character—Maverick. SPA-35. If nothing else, the Copyright Act "most certainly precludes the author of an unauthorized infringing derivative work from suing the author of the work which he has already infringed." SPA-35 (quoting *Anderson v. Stallone*, 1989 WL 206431, at *11 (C.D. Cal. Apr. 25, 1989)). For those reasons, the court rejected Gray's contention that any distinct "elements" of the Gray Scenes were entitled to protection, because preexisting *Top Gun* material entirely "pervaded" his scenes. SPA-33-35. And the court rejected Gray's claim that his use of *Top Gun* to create his own derivative works was authorized by Paramount through Kosinski or Singer, neither of whom had actual or apparent authority to convey to Gray "a right that they themselves did not possess." SPA-33-34.[2]

## SUMMARY OF THE ARGUMENT

I. The district court correctly granted summary judgment to Paramount on Gray's copyright infringement claim because the Gray Scenes are unauthorized derivative works not entitled to copyright protection. The record also provides additional grounds for affirmance.

---

[2] The district court also denied *Gray's* motion for summary judgment as to Paramount's infringement and fraud counterclaims. SPA-35-42. That denial is not at issue in this appeal.

A. The Gray Scenes are unprotected, infringing derivative works.

1. The Copyright Act gives the creator of a copyrighted work the "exclusive right" to prepare derivative works based on the original. 17 U.S.C. § 106(2). Section 103 of the Act confirms that exclusive right by providing that that "protection for a work employing preexisting material … does not extend to any part of the work in which such material has been used unlawfully." *Id.* § 103(a). This Court has thus recognized that "*unauthorized* derivative works are typically afforded no copyright protection." *Keeling v. Hars*, 809 F.3d 43, 48 (2d Cir. 2015).

2. The Gray Scenes are derivative works of *Top Gun*, Paramount's 1986 film from which Paramount alone has the exclusive right to create a sequel. And, as one would expect in a sequel, Paramount's protected material from *Top Gun* entirely pervades the Gray Scenes, which center on *Top Gun*'s marquee character—Maverick—and draw extensively from the original film's storyline. The Gray Scenes are thus unauthorized derivative works that are afforded no copyright protection. Gray's contrary arguments misunderstand the Copyright Act and should be rejected.

3. Gray was not authorized to use *Top Gun* to create the Gray Scenes, and certainly not to create his own copyrightable derivative work. Paramount obviously authorized no such thing—Gray admits that he hid his involvement from

Paramount because it would not have knowingly hired him for *Maverick*. Gray's improbable argument that Paramount's authorized screenwriter (Singer) and director (Kosinski) had either actual or apparent authority to empower Gray to create a derivative work that Gray—alone among all Paramount's collaborators—would own is entirely meritless, as the district court correctly concluded. And his new claim—raised for the first time on appeal—that he had an "implied license" from Paramount to create his own a copyrightable derivative work is both waived and wrong.

B. Gray's infringement claim is alternatively barred by equitable estoppel. Gray knew that Paramount would use the Singer Draft, including the supposed Gray Scenes, in creating *Maverick*. He actively kept his purported role in creating that material from Paramount. And Paramount invested hundreds of millions of dollars to create *Maverick*, justifiably believing it had the right to do so. These undisputed facts unquestionably satisfy the elements of equitable estoppel, a doctrine designed to prevent exactly what occurred here—a party lying in wait until a work becomes a success, and only then making his purported role in that work known.

C. The Gray Scenes are not copyrightable works of authorship in any case. They are inseparable from, and were intended to be incorporated into, the Singer Draft, and ultimately into the *Maverick* screenplay. Such constituent parts of a

copyrightable work—like a film—are not independently copyrightable works. *See 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247 (2d Cir. 2015).

II. The district court also correctly dismissed Gray's joint authorship claim on the pleadings.

A. A co-authorship plaintiff must plausibly allege that both parties fully intended to be co-authors. That is implausible on its face here, since Gray successfully hid his involvement from Paramount. And in any event, none of the factors this Court has identified supports such a claim. Gray had no decisionmaking authority over either the final *Maverick* screenplay or the resulting film. He was neither billed nor credited on the film. And Paramount's work-made-for-hire agreements with its authorized collaborators demonstrate that Paramount did not intend to share authorship with anyone, let alone someone whose involvement was kept secret from it.

B. Gray's contrary arguments are meritless. Contrary to Gray's contention, the requirements for establishing a joint authorship claim—which the district court faithfully applied—are well established in this Circuit. And the district court properly dismissed that claim at the pleadings stage without leave to amend, including because Gray never sought such leave. Indeed, discovery on Gray's infringement claim has only confirmed that his co-authorship claim fails.

## ARGUMENT

The district court correctly rejected Gray's implausible claim that he (alone among Paramount's collaborators) was a joint author or partial owner of *Maverick*. This Court reviews a district court's grant of a motions to dismiss and for summary judgment *de novo*. *Bellin v. Zucker*, 6 F.4th 463, 472-73 (2d Cir. 2021); *Bank of N.Y. v. First Millenium, Inc.*, 607 F.3d 905, 914 (2d Cir. 2010). Its judgment should be affirmed.

### I. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO PARAMOUNT ON GRAY'S COPYRIGHT INFRINGEMENT CLAIM

The Court can affirm the district court's rejection of Gray's copyright infringement claim on at least three grounds: (i) the Gray Scenes are infringing derivative works not entitled to copyright protection (as the district court correctly held); (ii) Gray is equitably estopped from claiming copyright infringement; and (iii) the Gray Scenes are not themselves independently copyrightable "works."[3]

#### A. The Gray Scenes Are Unprotected Infringing Works, As The District Court Correctly Held.

Under the Copyright Act, "unauthorized derivative works are typically afforded no copyright protection because they unlawfully infringe the exclusive

[3] Paramount also sought summary judgment on several additional grounds. Dkt. 76 at 16-25. In the unlikely event the Court does not affirm, it should remand for the district court to address those alternative arguments (or any alternative arguments presented in this brief if the Court chooses not to reach them).

rights of the original author" to create derivative works. *Keeling v. Hars*, 809 F.3d 43, 48 (2d Cir. 2015) (emphasis omitted). That is exactly what happened here. Gray allegedly set out to write scenes in a sequel to *Top Gun*—a derivative work—which, like any sequel, reused the original film's protected characters and storylines. Because only Paramount had the exclusive right to make such a sequel, *see* 17 U.S.C. § 106(2), and because the original *Top Gun* (including in particular its iconic Maverick character) pervades Gray's work, he has no copyright in the Gray Scenes.

1. *Copyright is unavailable for unauthorized derivative works*

The Copyright Act grants creators of "original works of authorship," like literary works, art, and motion pictures, 17 U.S.C. § 102(a), a series of rights, including the exclusive right "to prepare derivative works based on the copyrighted work," *id.* § 106(2); *see Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 526 (2023). A "derivative work" is a work "based upon one or more preexisting works," such as a translation, dramatization, motion picture version, "or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. Because the author of an original work has the exclusive right to create (or authorize the creation of) a derivative work, barring an exception like fair use, "*unauthorized* derivative works are typically afforded no copyright protection because they unlawfully infringe the exclusive rights of the original

author." *Keeling*, 809 F.3d at 48. And because all agree that Paramount owns the copyright in *Top Gun*, and that the Gray Scenes are derivative works of *Top Gun*, Gray can claim no copyright in the Gray Scenes, unless Paramount authorized him to write them.

Section 103 of the Act, which explains how and when copyright protection applies to the derivative works themselves, is consistent with Section 106(2). Section 103(a) provides that the "subject matter of copyright" includes "compilations and derivative works." If the author of a novel, for instance, wrote (or authorized someone else to write) a stage adaptation of that novel, Section 103(a) makes clear that that derivative work "is itself independently copyrightable." *Atticus Limited Liability Co. v. Dramatic Publ'g Co.*, 145 F.4th 257, 263 (2d Cir. 2025). Section 103(b), in turn, specifies what that derivative copyright protection covers—namely, "only … the material contributed by the author of such [derivative] work, as distinguished from the preexisting material employed in the work." 17 U.S.C. § 103(b). Thus, Section 103(b) "clarifies that while a derivative work which meets the standard of originality is protected, the existence of such protection does not vest [in the derivative's creator] any rights in the preexisting material on which the derivative work is based." 2 William F. Patry, Patry on Copyright § 3:58 (2026); *see Silverman v. CBS Inc.*, 870 F.2d 40, 49 (2d Cir. 1989).

Section 103(a) also buttresses Section 106(2)'s grant of exclusive rights to prepare derivative works. Specifically, it provides that "protection for a work employing preexisting material in which copyright subsists *does not extend* to *any part of the work* in which such material has been used *unlawfully*." 17 U.S.C. § 103(a) (emphasis added). Section 103(a) does not "qualify[] the exclusive right of the owner of the copyright of [an] original work to make derivative works." *Pickett v. Prince*, 207 F.3d 402, 406 (7th Cir. 2000). Rather, it clarifies that "the right to make a derivative work does not authorize the maker to incorporate into it material that infringes someone else's copyright." *Id.* To be entitled to protection, any "new, derivative noninfringing material cannot be present in 'any part of the [derivative] work' that contains infringing material." 2 Patry § 3:58. Section 103(a) thus "prevent[s] infringers from benefiting from their infringement, while simultaneously preserving protection for derivative material that is not infringing." *Id.*; *see* H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 57 (1976).

Consistent with these principles, this Court and its sister circuits have recognized that "*unauthorized* derivative works are typically afforded no copyright protection." *Keeling*, 809 F.3d at 48; *see, e.g.*, *Pickett*, 207 F.3d at 406; *Dam Things from Denmark, a/k/a Troll Company ApS, v. Russ Berrie & Co.*, 290 F.3d 548, 563 (3d Cir. 2002) ("[I]f the underlying work is itself protected by copyright, then [the author of the derivative work] will receive no protection at all; on the

contrary, he is a copyright infringer….”); *accord Hiller, LLC v. Success Grp. Int'l Learning Alliance, LLC*, 976 F.3d 620, 629 (6th Cir. 2020); *Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849, 852 (8th Cir. 2004); *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1016 (9th Cir. 2012); *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1197 (10th Cir. 2005).

2. *The Gray Scenes are an unauthorized derivative work pervaded by the original Top Gun*

a. Gray's copyrights in the Gray Scenes are invalid because they are an unauthorized (*see infra* Part I.A.3) derivative sequel to *Top Gun*. *See Keeling*, 809 F.3d at 48. Indeed, because a derivative is defined as "a work based upon one or more preexisting works" that "adapt[s]" the original, 17 U.S.C. § 101, it is "very difficult to see how a derivative work not made by the owner of the original work" or with the author's permission "could fail to infringe it." *Pickett*, 207 F.3d at 406. By definition, such works "unlawfully infringe the exclusive rights of the original author" to make its own derivative works. *Keeling*, 809 F.3d at 48.

This Court has, in dicta, suggested that Section 103(a) may sometimes permit copyright protection for an infringing derivative work so long as the infringing material does not "pervade the entire" derivative work. *See Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34 n.6 (2d Cir. 1982) (citation omitted). But "[i]n most cases regarding derivative works," it is not necessary to ask whether infringing material "pervades" the derivative "because the

determination that a work is derivative would necessarily imply that the preexisting work 'pervades' the derivative." *Hiller*, 976 F.3d at 629. "A derivative work is, by definition, bound to be very similar to the original." *Pickett*, 207 F.3d at 406. If the preexisting material did not "pervade" the derivative, then it "might not be [a] derivative work[]" at all. *Id.* at 407. Only in rare cases would the original material not pervade the derivative work. *Hiller*, 976 F.3d at 630.

*Maverick* is not such a rare case because Paramount's intellectual property—most notably, the Maverick character—undeniably pervades the Gray Scenes. Gray "based his entire script on existing material, including *Top Gun* characters, settings, and plot devices." SPA-35. By his own admission, he was "trying to write scenes for a movie called 'Top Gun: Maverick,' which is a follow-up to the original movie." Dkt. 111 ¶ 994. And the Gray Scenes' "entire premise and plot centers on" the marquee character of the original *Top Gun* film: Pete "Maverick" Mitchell. *Wozniak v. Warner Bros. Ent. Inc.*, 726 F. Supp. 3d 213, 238 (S.D.N.Y. 2024). The name "Maverick" (or nickname "Mav") appears nearly *500 times* in the Gray Scenes. *See* Dkt. 84-1-84-18. Virtually all of the Gray Scenes are about, feature dialogue by, or describe actions taken by Maverick.[4] Some scenes consist

[4] Indeed, only one of the Gray Scenes does not feature Maverick, but that nine-page scene centers on another character drawn from the original film—Goose's son. *See* Dkt. 84-4. Moreover, this scene echoes Goose's death in *Top Gun* by portraying Goose's son watching the death of a comrade, just as Maverick witnessed the loss of Goose. *Id.*; Dkt. 111 ¶¶ 998-1000. In any event, neither this

almost entirely of Maverick dialogue. *See, e.g.*, Dkt. 84-9. Indeed, without the Maverick character and other characters derived from *Top Gun*—like Goose's son, Rooster, often called "Goose Jr." in the Gray Scenes—the Gray Scenes would be unintelligible. And it is beyond dispute that a fictional character like Maverick is protected by Paramount's copyright in *Top Gun*. *See, e.g.*, *Detective Comics v. Bruns Publ'ns*, 111 F.2d 432, 433-34 (2d Cir. 1940); *Warner Bros. Inc. v. Am. Broad. Companies, Inc.*, 720 F.2d 231, 240-41 (2d Cir. 1983).

Even setting Maverick aside, the original film's storyline likewise pervades the Gray Scenes. For instance, the choice to include Goose's son as a central character resonates only because of the events in the original *Top Gun*, and to that end, the Gray Scenes rely on express references to those events. *See, e.g.*, Dkt. 84-15 at 6 (Goose's son asking Maverick, "how did my dad do it all and still keep his head in the game?"); *id.* at 7 (Maverick: "Goose worked his juju and always came through in the clutch. He was an artist."). Likewise, the final three Gray Scenes feature Maverick and Goose's son stealing an F-14 together, with Goose's son (like Goose in *Top Gun*) serving as Maverick's radio intercept officer. Dkt. 84-15, 84-17, 84-18. Again, those scenes resonate precisely because they call back to the plot of *Top Gun*.

---

scene as written nor any scene resembling it even appears in the final *Top Gun: Maverick*. Dkt. 111 ¶¶ 281-84.

To be sure, Gray would not infringe *Top Gun* merely by incorporating into his work the "facts themselves" underlying the original film—like the existence of the F-14 or the Navy's fighter pilot school. *Feist Publ'ns, Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 349 (1991); *see Yonay v. Paramount Pictures Corp.*, 163 F.4th 685, 694 (9th Cir. 2026). But that is not what the Gray Scenes do. Rather, as is expected for a sequel, they reference and rely on the protected characters and plot of *Top Gun*. That *expression* pervades the Gray Scenes, and therefore, "protection … does not extend to any part of" them. 17 U.S.C. § 103(a).[5]

b. Gray's opening brief does not dispute much of this. He does not dispute, for instance, that Paramount has a copyright in *Top Gun* and the exclusive right to prepare derivative works based upon it, 17 U.S.C. § 106, or that the Gray Scenes

[5] Contrary to Gray's suggestion, Br. 2, 21, 25-26, there is no inconsistency between Paramount's positions in this case and in *Yonay*. Gray never identifies any factual assertion that Paramount made in *Yonay* that is contradicted here. Nor could he. In *Yonay*, the Ninth Circuit held that *Maverick* did not infringe a non-fiction article about the real-life Navy school, in part because the article's "facts about pilot training," about aircraft design, and about the existence of the Top Gun program were just facts, not protected expression. *See Yonay*, 163 F.4th at 693-96. Here, Paramount argues that Gray infringed *Top Gun* by writing a derivative sequel specifically intended to continue the fictional *Top Gun* story and centering on the film's signature fictional character, Maverick. There is no tension, let alone "a true inconsistency," between these positions. *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72-73 (2d Cir. 1997).

were intended to be just that. And he does not dispute that the Gray Scenes center on the journey of *Top Gun*'s signature character, Maverick. Br. 31.[6]

Instead, Gray repeats time and again that Section 103 "commands courts to filter, not to forfeit," Br. 17, 21, meaning that, in his view, Gray's copyright is invalid only with respect to "the offending parts under § 103(a)"—that is, the preexisting material in which Paramount holds a copyright—"not Gray's separable original expression, protected under § 103(b)," Br. 21. In other words, Gray maintains that Section 103(a) "reserves for filtered inquiry into what, if anything was used unlawfully and § 103(b) reserves for part-by-part analysis of what is original to the derivative author." Br. 33. Thus, while not disputing that the Gray Scenes center on the copyrighted Maverick character, Gray maintains that he is entitled to copyright protection for particular "parts" of those scenes—for instance, specific cutaways described in the Gray Scenes, his dictation of "the editorial rhythm on the page," or particular lines of dialogue (virtually none of which, for the record, made it into the final *Maverick* film). Br. 31-33.

In light of the foregoing, it is obvious that this argument is wrong.

---

[6] Puzzlingly, Gray asserts that the "third-act mission" in Gray Scenes 4 through 13 is "independent of any character carried over from *Top Gun*," Br. 32, despite the fact that those scenes depict Maverick planning, selecting a team for, and then leading the aforementioned mission (featuring his name over 400 times).

*First*, Gray's argument would rewrite the statute. Section 106(2) gives a copyright owner the "exclusive" right "to prepare derivative works" (or to authorize others to do so). 17 U.S.C. § 106(2). And a derivative work, by definition, must include some new elements, or else it would not "recast[], transform[], or adapt[]" the original. *Id.* § 101. The "exclusive" right to make a derivative therefore necessarily encompasses the right to create something new "based upon" one's own copyrighted material, by incorporating new expression distinct from the original.

If Gray's "filtered inquiry" theory were right, then Section 103(a) would repeal Section 106(2). The owner of a copyright could claim an "exclusive" right only to the original work itself, and *anyone else* would have the right to recast, transform, or adapt an original work (i.e., create a derivative work), because they would own a copyright in the recast, transformed, or adapted portions—the very material that makes the work a derivative. Section 103(a) does not, however, "qualify[] the exclusive right of the owner of the copyright of the original work to make derivative works based on that work." *Pickett*, 207 F.3d at 406.

Gray's theory rewrites Section 103(a) too. That section provides that "protection for a work employing preexisting material in which copyright subsists does not extend to *any part* of the work *in which such material* has been used unlawfully." 17 U.S.C. § 103(a) (emphasis added). Gray would revise it to state:

"protection for a work employing preexisting material in which copyright subsists does not extend to ~~any part of the work in which such~~ material <u>that</u> has been used unlawfully." Congress could have chosen to deny "protection only to the infringing material itself, rather than, as it did, to 'any part of the work in which such material has been used unlawfully.'" 2 Patry § 3:59. But it did not. By disallowing protection for "any part" of a derivative work "in which" preexisting material is used unlawfully, Section 103(a) necessarily captures all "parts" of the derivative work in which such copyrighted material is used. That language clearly "contemplate[s] the denial of protection to noninfringing material when it is included with infringing material as a penalty for the infringement." 2 Patry § 3:59; Paul Goldstein, Goldstein on Copyright § 2.16 (3d ed. 2026) ("[S]ection 103(a) will entirely bar copyright for a derivative work such as a translation or motion picture that unlawfully borrows from a copyrighted story."); 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 3.06 (2026) (similar).

*Second*, even if Gray's argument were not foreclosed on its face by the Act's text, it still could not be squared with the case law suggesting that, at a bare minimum, Section 103(a) denies copyright "to derivative works in which the [unlawfully used] pre-existing work tends to pervade the entire derivative work." 1 Nimmer § 3.06; *see Eden Toys*, 697 F.2d at 34 n.6; *Hiller*, 976 F.3d at 629; Br. 28-29. Again, that rule acknowledges that there are always elements of a

derivative work that differ from the original. Even so, if unauthorized material "pervades"—i.e., appears throughout—the derivative, Section 103(a) furnishes no protection. That is the only way to "prevent[] an infringer from benefitting, through copyright protection, from committing an unlawful act." H.R. Rep. No. 94-1476, at 57.

Nor do the cases on which Gray relies help him. *See* Br. 24-26. *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469 (2d Cir. 1951), for instance, just stands for the rule that Section 103(b) itself provides—that a valid derivative copyright does not give the derivative owner any rights in the original. *Id.* at 471. The same goes for *Atticus Ltd. Liability Co. v. Dramatic Publishing Co.*, 145 F.4th 257, 263 (2d Cir. 2025), and *Weissmann v. Freeman*, 868 F.2d 1313, 1317 (2d Cir. 1989) (rejecting holding that "all derivative works based upon jointly authored works" are "joint works"). These cases do not qualify Section 106(2)'s rule that the owner of the original work has the "exclusive" right to create a derivative work, or Section 103(a)'s rule that copyright extends to no part of a derivative in which preexisting material was used without authorization. And, contrary to Gray's suggestion, *Silverman* emphasized the *limits* of copyright in derivative works, stressing that such copyrights "secure protection only for the incremental additions of originality contributed by the authors of the derivative works." *Silverman*, 870 F.2d at 49. Like the rest of Gray's cases, *Silverman* does not

suggest that Section 103 gives the creator of an *unauthorized* derivative work rights that Section 106(2) expressly reserves to the original copyright holder.

*Third*, even assuming Gray's "filter" analysis had any basis in law, his suggested "part-by-part analysis of what is original to the derivative author," Br. 33, would make sense only when a derivative work actually included separable "parts." That might be the case, for instance, when dealing with compilation or collective work, i.e., a work "in which a number of contributions, constituting *separate and independent works in themselves*, are assembled into a collective whole." 17 U.S.C. § 101 (emphasis added). Thus, "the owner of copyright in an anthology of poetry could sue someone who infringed the whole anthology, even though the infringer proves that publication of one of the poems was unauthorized," as the unlawful use of preexisting material in that one discrete part of the anthology would not necessarily infect other discrete parts where use was legal. H.R. Rep. No. 94-1476, at 57-58.

That analysis makes no sense, however, in the context of the Gray Scenes. It is undisputed that the Gray Scenes are derivative works. And again, "[i]n most cases regarding derivative works," it is unnecessary to ask whether the preexisting work "pervades" the derivative "because the determination that a work is derivative would necessarily imply" that it does, rendering the derivative copyright invalid. *Hiller*, 976 F.3d at 629 (citing *Pickett*, 207 F.3d at 407). That is, in the

mine-run of cases, "a work that 'adapts' or 'recasts' another work without permission would contain no discrete 'parts' that did not unlawfully use the original work." *Id.*

That general rule applies here. Even assuming that each Gray Scene is a "work" eligible for copyright protection, *see infra* Part I.C, Gray cannot identify any "discrete parts" of those scenes that could be separated out from, and accorded protection independent of, the parts that unabashedly use *Top Gun*. Attempt to remove Maverick's actions and dialogue from the scenes, and the result is gibberish. Take Gray Scene 7: It features Maverick briefing his team on the difficult mission ahead, with other pilots occasionally interjecting with observations like, "Jeezus H., this is nuts." Dkt. 84-9. Erase Maverick from that scene, and the result is ten pilots sitting silently for ten minutes in a briefing room, occasionally piping up only to respond to a description of a mission that they never heard.

Gray asserts that he is entitled to copyright protection for his "separable expression," Br. 31, like "the situation, the order and escalation of the story beats, the staging, and the suspense," *id.*, the use of "a cutaway to a lone enemy watch-post," *id.* at 32, or the descriptions of "whining" and "blue fire" from jet engines, *id.* at 10. It's unlikely such devices are copyrightable at all. *See Keeling*, 809 F.3d at 51 ("Keeling could not copyright the commonly used individual stage directions

and theatrical devices—e.g., the concept of drafting an audience member to play the lead, the reliance on cue cards, or the use of squirt guns….”); Br. 24 (acknowledging that original features in a derivative work must be non-trivial). But in any event, Gray never explains how such minutiae could in any sense constitute separable "parts" of each Gray Scene, or how that "expressive architecture" (whatever that means) is in any way "separable" from the character of Maverick, who is invariably the focal point of that "architecture." Br. 33. Under those circumstances, the district court was right to hold at summary judgment that Paramount's copyrighted material pervaded the Gray Scenes, as trial courts have frequently done when faced with similar unauthorized sequels. *See, e.g.*, *Anderson*, 1989 WL 206431, at *8-11; *Wozniak*, 726 F. Supp. 3d at 236-39; *Polychron v. Bezos*, 2023 WL 6192743, at *8 (C.D. Cal. Aug. 14, 2023). Doing so does not require weighing any disputed facts. It simply recognizes that a sequel is a sequel.

3. *Gray was not authorized to use Paramount's copyrighted material to make the Gray Scenes*

Gray is accordingly not entitled to copyright protection if "such material has been used unlawfully," 17 U.S.C. § 103(a), i.e., if it was "*unauthorized*," *Keeling*,

809 F.3d at 48.[7] The district court correctly held that Gray had no authority to create the Gray Scenes.

Gray does not dispute that Paramount never directly authorized him to create derivative works of *Top Gun*. Indeed, Paramount did not even know Gray was supposedly involved in *Maverick* until well after the film's release. Instead, Gray contends that Kosinski and Singer, who were employed by Paramount to create *Maverick* as a work-made-for-hire, had actual or apparent authority to authorize Gray to use *Top Gun* and other preexisting materials to make his *own* derivative work, which Paramount would not own.

The district court correctly rejected that implausible argument. And Gray's contention that he had an "implied license" from Paramount to create his own derivative sequel to *Top Gun*—made for the first time on appeal—is both waived and wrong.

**Actual Authority.** An agent has actual authority only "if the principal has granted the agent the power to enter into contracts on the principal's behalf," "subject to whatever limitations the principal places on this power, either explicitly

[7] Gray also repeatedly draws the distinction between "unlawful" use and "unauthorized" use. *See* Br. 25, 28-29. But the statute's use of the word "unlawful," rather than "unauthorized," simply establishes that some uses—like fair use or parody—can be unauthorized and yet not infringe the preexisting copyright. *See Keeling*, 809 F.3d at 47-49. Here, of course, Gray does not claim any fair use; he claims to have written and copyrighted a derivative work of *Top Gun*, without Paramount's permission.

or implicitly." *Highland Cap. Mgmt. LP v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010). "An agent's power to bind his principal is coextensive with the principal's grant of authority," and "[o]ne who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority." *Ford v. Unity Hosp.*, 32 N.Y.2d 464, 472 (1973); *see* 2A C.J.S. Agency § 144 (2026) ("To prove that an agent had actual authority, a plaintiff ultimately must show evidence that … the alleged conduct fell within the scope of the agency.").

Here, the district court correctly found that "under their own contracts with Paramount, neither Singer nor Kosinski had any right to copyright what they produced for *Top Gun: Maverick*, let alone the authority to grant such an unusual right to Gray." SPA-33. Even assuming Kosinski and Singer were Paramount's agents (in the limited sense of being hired to help develop *Maverick*), there is no dispute that they lacked actual authority to bring Gray on as a co-author of *Maverick* or to license Gray to make his own derivative works with Paramount's intellectual property. Indeed, that is how Kosinski and Singer—Paramount's actual counterparties—understood their own contracts. Dkt. 77 ¶¶ 4-6; Dkt. 81 ¶¶ 4-6. Not only do their contracts give them no authority to deal in Paramount's intellectual property licensing, the contracts actually limit their *own* intellectual property rights, providing that their creations "shall be deemed a 'work made for hire'" for Paramount, with Paramount being "the sole owner of the results and

proceeds." Dkt. 82-4 at 32; *see* Dkt. 82-5 at 16, 35 ("Company, as author, shall own the copyright in the Material forever…."). Singer agreed that his work would "be solely written by" himself, and Singer and Kosinski each represented that the products of their services would be "wholly original with" them and would "not infringe upon or violate any copyright of … any person. Dkt. 82-5 at 36; Dkt. 111 ¶ 114. Neither agreement authorized them to use *Top Gun* beyond the narrow purpose of creating a work-made-for-hire for Paramount. Certainly, neither agreement authorized them to *license* Paramount's derivative-works rights to a third party unknown to Paramount.

Gray's contrary arguments are meritless. He asserts that "all evidence confirms the studio authorized the derivative use of *Top Gun*" and that it is undisputed that "Paramount authorized Singer and Kosinski to use Paramount's preexisting *Top Gun: Maverick*- related materials, including the original *Top Gun* film, to develop the screenplay." Br. 38. "The dispute," he says, "is whether Gray … *shared* in their authorization." *Id.* (emphasis added). But that would not give Gray an independent right to create his own, copyrightable derivative work, for neither Kosinski nor Singer had such "authorization." If Gray "shared in" Kosinski and Singer's "authorization" to use *Top Gun*, the only authorized use would be to make a work-made-for-hire that Paramount would own.

Gray also cites language in Kosinski's and Singer's contracts referencing work done "either alone or in collaboration with others." Br. 41-42; *see* Dkt. 82-4 at 32; Dkt. 82-5 at 35; *id.* at 16. Gray suggests that language gave Kosinski and Singer the right to work with "collaborators of their choosing." Br. 42. As Paramount explained below, that reading makes little sense, as the only interpretation of the collaboration clause that harmonizes all terms of the contract is that collaboration was permitted only with Paramount's other work-made-for-hire contributors. *See* Dkt. 125 at 4; Dkt. 82 ¶¶ 6, 8. But, in any event, those clauses mention "collaboration" specifically in the context of provisions deeming the product of any such collaboration "work made for hire" *for Paramount*. Dkt. 82-4 at 32; Dkt. 82-5 at 16, 35. Those provisions thus underscore the dispositive point: Neither Kosinski nor Singer, as work-made-for-hire contributors, had any actual authority to license Paramount's intellectual property to another or to give Gray derivative-work rights that they themselves did not have.

**Apparent Authority.** For two independent reasons, Gray's theory of apparent authority fares no better.

*First*, absent actual authority, an agent "may nonetheless bind his principal" only if *the principal* "has created the appearance of authority, leading the other … party to reasonably believe that actual authority exists." *Highland*, 607 F.3d at 328. That is, "apparent authority is dependent upon verbal or other acts *by a*

*principal* which reasonably give an appearance of authority to conduct the transaction." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1462 (2d Cir. 1995) (citation omitted). Here, whatever the nature of his interactions with Kosinski and Singer, Gray *never* interacted with Paramount (since Gray claims to have worked with Singer in secret), and *Paramount* communicated nothing to Gray that would lead a reasonable person to believe Kosinski and/or Singer could authorize him to create a copyrightable derivative work.

Gray contends that Paramount nevertheless vested Kosinski and Singer with apparent authority by placing them in the positions of director and screenwriter. Br. 44-46. "Any person in Gray's position," he says, would believe "that the film's director and screenwriter … were authorized to permit him to use *Top Gun*" intellectual property. *Id.* at 46. Of course, this Court has recognized that the "appointment of a person to a position with generally recognized duties may create apparent authority." *First Fid. Bank, N.A. v. Gov't of Antigua & Barbuda*, 877 F.2d 189, 193 (2d Cir. 1989); *accord* Restatement (Third) Of Agency § 3.03 (2006). Thus, a corporate title like "president" or "chief executive officer" can sometimes convey apparent authority over transactions "falling within the ordinary course of the corporation's business." Restatement (Third) Of Agency § 3.03. But, while a director may have "tremendous authority over the creative development of a film," Br. 40, Gray offers no evidence that a director has *any*

authority over a studio's intellectual property licensing. Not even all *officers* of a corporation have apparent authority generally to transact business for a corporation, *see* Restatement (Third) Of Agency § 3.03 (secretary, treasurer, and vice president titles, without more, convey limited if any apparent authority), and a director or a screenwriter hired on a particular project is not even an officer of a film studio. Because Gray has offered no evidence that a director or screenwriter is customarily endowed with power to divest a film studio of its intellectual property rights—an implausible proposition on its face—Gray cannot carry his burden to prove apparent authority based on those titles alone. *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 72 (2d Cir. 2012).

*Second*, a third party "cannot claim that an agent acted with apparent authority when it 'knew, or should have known, that [the agent] was exceeding the scope of its authority.'" *Highland*, 607 F.3d at 328 (citations omitted) (alterations in original). And here, Gray has admitted that he *knew* Paramount had not authorized Singer to make him a co-writer, let alone to give Gray (and only Gray) rights to make his own *Top Gun* derivative works. According to Gray's own testimony, before starting work on the Singer Draft, Gray and Singer "made an agreement" that Gray would have "to wait until we turned in the script," and only then would Singer "approach Paramount and notify them that [Gray] was his co-writer and that Paramount would then have to *add me to a contract*." Dkt. 84-64 at

10 (emphasis added). He testified that he understood Paramount had a contract permitting Singer to write *Maverick*, and that Paramount "would need to also create a contract with me as a writer." *Id.*; *see* Dkt. 84-65 at 47 ("I'm not officially a writer until I get my contract from the studio."). Similarly, in his January 2023 narrative of events, Gray explained that he and Singer agreed that they would "ask forgiveness [rather] than permission," and that they would wait until "after the script was written" to "set the record straight" and tell Paramount that Gray had participated, because disclosing Gray's role to Paramount too early "risked blowing up the deal and could cause us to lose the project entirely." *See* Dkt. 82-11; *supra* at 6-9.

In short, Gray knew that Singer had no authority to bring him on *even as a work-made-for-hire* screenwriter, let alone a screenwriter with rights to make a derivative work exceeding Singer's own rights. Otherwise, there would have been no need for Paramount to separately contract with Gray after the submission of the Singer Draft—or, for that matter, to keep Gray's participation a secret. And the same facts preclude Gray's argument that Kosinski had apparent authority. Again, Gray's admitted goal was to hide his participation from Paramount, because he knew that Paramount would not agree to his participation if he had been forthright. In those circumstances, it would have been entirely unreasonable for him to believe that Kosinski was authorized to grant him intellectual property rights that he knew

Paramount itself would not have granted him. At the very least, once Singer cautioned that Gray's role should be kept a secret from Paramount, Gray had a duty to inquire as to whether Singer or Kosinski had any authority to involve him on *Maverick*. *F.D.I.C. v. Providence College*, 115 F.3d 136, 141 (2d Cir. 1997). He did no such thing.

**Implied License.** In a final salvo, Gray argues that Paramount—again, through Singer and Kosinski—granted him an implied license to create his own derivative *Top Gun* sequel. Br. 47-48. Gray never raised that theory in the district court, so the argument is waived. *Slattery v. Hochul*, 61 F.4th 278, 293 n.9 (2d Cir. 2023). In any event, it fails for the same reasons as his agency theories. Paramount could not have granted Gray an implied license to create his own derivative work when neither Kosinski nor Singer was authorized to grant such a license, either actually or apparently. And even if Gray had some implied license to use *Top Gun* by virtue of Paramount's "authoriz[ing] Singer and Kosinski to develop the sequel," Br. 47, Gray never explains how that implied license could *exceed* the license Singer and Kosinski had, which was limited to creating a work-made-for-hire with the copyright owned by Paramount.

### B. Gray's Infringement Claim Is Barred By Equitable Estoppel.

This Court should affirm for the reasons given by the district court. But it can also affirm on the alternative ground that Gray's infringement claim is barred

by equitable estoppel, an issue briefed but not decided below. *See, e.g.*, *Schwebel v. Crandall*, 967 F.3d 96, 99 (2d Cir. 2020) (affirming grant of summary judgment on alternative grounds of equitable estoppel). A copyright claim is estopped when "(1) plaintiff had knowledge of the defendant's infringing conduct; (2) plaintiff either (a) intended that defendant rely on plaintiff's acts or omissions suggesting authorization, or (b) acted or failed to act in such a manner that defendant had a right to believe it was intended to rely on plaintiff's conduct; (3) defendant was ignorant of the true facts; and (4) defendant relied on plaintiff's conduct to its detriment." *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 321 (2d Cir. 2022) (citation omitted). By Gray's own account, Paramount satisfies each of those criteria.

1. *Gray had knowledge of Paramount's allegedly infringing conduct.*

At all relevant times, Gray knew—indeed, intended—that Paramount would use the supposed Gray Scenes in creating *Maverick*. Gray testified that, throughout much of 2017, he and Singer collaborated on the Singer Draft, which was submitted to Paramount "without [his] name on it" in November 2017, with plans to use it to further develop *Maverick*. Dkt. 84-65 at 45-46. Yet he said nothing. Moreover, if Gray had any doubt about Paramount's plans, that doubt dissipated by 2019. In July 2019, he watched the theatrical trailer for *Maverick*, noting specifically that it featured Maverick's "inverted pull over the mountain"—

a sequence in which Maverick flips his plane over the top of a ridge to strike an enemy target—which appears in Gray's claimed "Scene 12" and was one of his proudest supposed contributions to the Singer Draft. *See* Dkt. 111 ¶¶ 53-56. Then, in April 2020, Singer told Gray that the WGA credit arbitration had concluded, with Singer receiving a writing credit, using a screenplay that Gray claims to have largely authored. Dkt. 111 ¶ 58. Finally, on May 29, 2022, during the film's opening weekend, Gray saw *Maverick* in theaters, even emailing Kosinski to praise the final product. *Id.* ¶ 59.

In sum, Gray claims that, between 2017 and 2022, he wrote the bulk of a draft screenplay; saw that draft submitted to Paramount without his name on it; saw Singer receive credit as screenwriter for that script; watched a trailer for the film featuring what he considered some of his best work; and finally watched the movie itself—and yet at no point until January 23, 2023, after the film had completed its theatrical run, did he claim to have made any written contributions to *Maverick*. Throughout that period, Gray knew that Paramount was using his supposed Gray Scenes. But he said nothing.

2. *Gray acted in a manner that gave Paramount a right to believe it could use the "Gray Scenes."*

Gray clearly acted in a manner that led Paramount to believe it could proceed with production of *Maverick* using the Singer Draft. He stayed silent for years, despite knowing that Paramount was going to use the Singer Draft to make

*Maverick*. But Gray's conduct goes beyond mere silence. According to his own narrative, he actually *intended* that Paramount forge ahead without knowing about his purported role.

According to Gray, he and Singer agreed that Singer would contract with Paramount to write a screenplay for *Maverick* as a solo writer because they worried disclosing Gray's role to Paramount too soon "risked blowing up the deal and could cause us to lose the project entirely," or could "cause the size of that deal [with Paramount] to be greatly reduced." Dkt. 111 ¶¶ 62-68; Dkt. 82-11 at 3. Gray knew this scheme was wrongful, likening it "ask[ing] forgiveness [rather] than permission. Dkt. 111 ¶ 67; Dkt. 82-11 at 3. In short, Gray understood that he would be secretly ghost-writing portions of the Singer Draft and that Paramount would believe that draft to be Singer's work alone.

But Gray never even bothered to "ask forgiveness"—instead he *continued* to conceal his purported role from Paramount for years, while Paramount spent hundreds of millions of dollars developing, producing, and releasing *Maverick*, having no reason to doubt its chain of title. According to Gray, he contemplated revealing himself in October 2017, when Singer submitted his draft to Paramount, but elected not to do so for fear that it "could potentially blow up the movie." Dkt. 111 ¶¶ 73-79; Dkt. 82-11 at 4-5. So—*with Gray's knowledge*—Singer's name was put on the cover of the Singer Draft, with Gray's nowhere to be found. Dkt. 111

¶ 76; Dkt. 82-11 at 4-5. And in 2019, when Gray learned the WGA was beginning its credit arbitration, Gray recognized that "was the exact process to submit both our names on the draft." Dkt. 111 ¶¶ 84-87; Dkt. 82-11 at 5. But Gray nevertheless decided not to get involved. *Id.*

Gray's efforts below to blame Singer for this course of conduct, claiming that he needed to stay in Singer's good graces to further his career, are immaterial; they do not change the inequity of Gray's conduct *vis-à-vis* Paramount. Any suggestion that Gray lacked the ability to reveal his role to Paramount is equally unavailing. Indeed, in April 2019, Gray negotiated and entered into a contract with Paramount to write on a separate television project—while represented by the *same respected entertainment attorney who ultimately sent Gray's statement to Paramount in January 2023.* Dkt. 111 ¶ 83. Yet still, Gray said nothing.

3. *Paramount was ignorant of the true facts.*

Consistent with Gray's plan, Paramount neither knew nor had reason to know of his purported role in *Maverick*. *Supra* at 6-9, 35-36. Paramount had contracted with Singer, Kosinski, and all other contributors to the *Maverick* screenplay to create that material as work-made-for-hire for Paramount. *See* Dkt. 82-2, 82-3, 82-4, 82-5, 82-6, 82-7. It had received the Singer Draft, which included Singer's name—but not Gray's—as an author, as Gray knew. Dkt. 81-8 at 2. And the WGA's credit arbitration yielded a screenwriting credit for Singer,

while Gray did not so much as submit a claim. Dkt. 111 ¶¶ 103-07. Gray cannot concoct a plan to hide his purported authorship from Paramount, and then complain when that plan works.

Gray's argument below—that Singer and Kosinski knew of his supposed role, and their knowledge must be imputed to Paramount, *see* Dkt. 116 at 13-14—runs contrary to basic principles of agency law. For starters, only "the knowledge [agents] acquire while acting within the scope of their authority" can be imputed to the principal. *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010). But, as already explained, to the extent that Singer and Kosinski were Paramount's agents at all, they were not authorized to bring Gray on as a co-writer, let alone to license him to use *Top Gun* to create his own derivative work. *Supra* at 29-37.

Moreover, under New York law, an agent's knowledge is not imputed to the principal "when an agent acts adversely to its principal." *Bank of China v. NBM LLC*, 359 F.3d 171, 179 (2d Cir. 2004). That is so because, "where an agent, though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) (citation omitted). Here, by Gray's own telling, Singer purportedly conspired with him to keep Paramount in the dark to maximize *his own* financial interests, at Paramount's

expense. *Supra* at 6-9, 35-37. Indeed, Gray believed that Singer had "defrauded" Paramount. Dkt. 84-64 at 35-36, 77.

Further, as to Kosinski, Gray admitted that he never told Kosinski that Paramount could not use his alleged contributions to *Maverick*. Dkt. 111 ¶ 113. To the contrary, after seeing a trailer for *Maverick* featuring content he claimed to have written, Gray emailed Kosinski, "just saw the Maverick trailer, it's f—king amazing!" Dkt. 111 ¶¶ 53-54; Dkt. 84-33. Estoppel does not require that a defendant lack knowledge of the plaintiff's role altogether (though Paramount certainly was unaware of Gray's role); in the typical estoppel case the defendant is fully aware of the plaintiff's contributions, but has been led to believe it could nonetheless use the work. *See, e.g.*, *Carson v. Dynegy, Inc.*, 344 F.3d 446, 454-55 (5th Cir. 2003); *Slate v. Am. Broad. Companies, Inc.,* 941 F. Supp. 2d 27, 43 (D.D.C. 2013), *aff'd*, 584 F. App'x 2 (D.C. Cir. 2014).

In any case, "imputation protects innocent third parties but not those who know or have reason to know that an agent is not likely to transmit material information to the principal." Restatement (Third) Of Agency § 5.04; *see* 4D N.Y. Prac., Com. Litig. in New York State Courts § 102:46 (5th ed. 2026) ("Knowledge is not imputed, however, if the third party has reason to know the agent will not give the message to the principal."); 2A N.Y. Jur. 2d Agency § 312 (2026); *Bd. of Educ. of Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley*, 539

N.Y.S.2d 814, 819 (App. Div. 1989); *Mut. Life Ins. Co. of N.Y. v. Hilton-Green*, 241 U.S. 613, 622-23 (1916). Here, Gray *knew* that neither Singer nor Kosinski revealed his purported role to Paramount—hence his repeated acknowledgements that "Paramount didn't know." Dkt. 111 ¶ 121. Indeed, if Gray genuinely believed that Paramount knew of his purported writing role through Singer or Kosinski, then he would not have asserted that "[i]n late October 2017 [he] believed it was time to notify the Studio," or that he felt the need to continually "nag[] and pester[] [Singer] about notifying Paramount," or that, at the time of the WGA credit arbitration, he doubted Singer's "intentions to ever notify the … Studio that I was his co-writer." *Id.* ¶¶ 122-24.

4. *Paramount relied on Gray's conduct to its detriment.*

Finally, Paramount relied on Gray's conduct to its detriment. Paramount would not knowingly produce and release a film based on a screenplay that it did not have the rights to use. It took pains to secure exclusive rights by entering into work-made-for-hire agreements with its screenwriters. Had Gray not hidden his alleged role, Paramount would have admonished Singer not to involve him, excised the supposed Gray Scenes from the script, or, at the very least, required Gray to enter into a work-made-for-hire agreement like *every other* collaborator. Dkt. 82 ¶¶ 12, 23. But Gray's concealment prevented Paramount from taking any remedial action, with potential infringement damages skyrocketing through

*Maverick*'s theatrical run. As it is, Paramount spent years and hundreds of millions of dollars on a film (including paying screenwriters like Singer for his draft) that Gray later claimed appropriated his copyrighted material, although he knew of that supposed appropriation years earlier.

The elements of equitable estoppel are thus easily satisfied here.

### C. The Gray Scenes Are Not Independently Copyrightable Works.

Alternatively, this Court can affirm because the Gray Scenes—which are inseparable from, and which Gray always intended to incorporate into, the Singer Draft of *Maverick*—are not independently copyrightable at all.

The Copyright Act confers copyright protection only on "works of authorship," such as "literary works," "musical works," and, as relevant here, "motion pictures and other audiovisual works." 17 U.S.C. § 102. In *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247 (2d Cir. 2015), this Court addressed "whether an individual's non-*de minimis* creative contributions to a work in which copyright protection subsists, such as a film, fall within the subject matter of copyright, when the contributions are inseparable from the work and the individual is neither the sole nor a joint author of the work and is not a party to a work-for-hire arrangement." *Id.* at 256. Under facts not meaningfully different from those here, this Court held that the answer was no. *Id.*

In *Casa Duse*, a film director claimed to hold a copyright in his "creative contributions to the film." *Id.* at 255. Although he had "exercised a significant degree of control over many of the creative decisions underlying both the raw film footage and the finished product," this Court held that those contributions did "not themselves constitute a 'work of authorship' amenable to copyright protection." *Id.* at 256, 260. Motion pictures "may be expected to contain contributions from multiple individuals," but the statute "lists none of the constituent parts" of such a work—like individual scenes in a screenplay—as "works of authorship," implying that "non-freestanding contributions to works of authorship are not ordinarily themselves works of authorship." *Id.* at 257.

The Act's definitions of "joint work" and "collective work" bolstered that conclusion. A "joint work" is a work prepared by multiple authors "with the intention that their *contributions* be merged into inseparable or interdependent parts of a unitary whole." *Id.* (quoting 17 U.S.C. § 101). That definition "suggests that such inseparable contributions are not themselves 'works of authorship.'" *Id.* By contrast, the Act provides that copyright "may subsist in contributions to a collective work," but "only when such contributions constitute 'separate and independent' works" themselves. *Id.* (quoting 17 U.S.C. § 101). Unless a film "incorporates separate, freestanding pieces"—think an anthology film like Disney's *Fantasia* or the Coen Brothers' *The Ballad of Buster Scruggs*—individual

contributions "merge into a unified whole" and do not warrant separate protection themselves. *Id.* (citation omitted). A contrary theory "would result in [a] legal morass[,] … [making] Swiss cheese of copyrights." *Id.* at 258 (quoting *Garcia v. Google, Inc.*, 786 F.3d 733, 742 (9th Cir. 2015) (en banc)).

To be sure, contributors of "separate elements" that are merged "into a unified whole," like a screenplay or film, may claim to be a joint authors of that completed work. *Id.* at 257 (citation omitted). But where, as here, this Court's joint-authorship test is not satisfied, *see infra* Part II, *Casa Duse* makes clear that the result is not to mince the copyrightable work of authorship into increasingly smaller pieces, until each putative co-author owns his own contributions.[8] Indeed, that result "would grant contributors" to a unified work "greater rights than joint authors," who "have no right to interfere with a co-author's use of the copyrighted work." *Casa Duse*, 791 F.3d at 259. Congress clearly did not intend that result.

The district court rejected Paramount's reliance on *Casa Duse* because that case concerned the contributions of a director rather than a purported screenwriter. SPA 20-21, 31. But that distinction makes no difference, and *Casa Duse*'s logic is dispositive here. Gray says he always envisioned the Gray Scenes as

---

[8] Rather, the Court applies the "dominant author" test to determine which of multiple putative authors is entitled to unitary copyright in the combined work. *Casa Duse*, 791 F.3d at 260. Here, of course, Gray does not, and cannot, claim to be the "dominant author" of either the Singer Draft or of *Maverick*.

interdependent parts of a unitary whole—the screenplay draft he was helping Singer prepare. *See* Dkt. 86 ¶ 925; Dkt. 111 ¶ 925. He testified, for instance, that he "was trying to write scenes for a movie called 'Top Gun: Maverick,'" Dkt. 84-65 at 30, and that his contributions "would come together" with Singer's "to be a cohesive whole"—"a script," *id.* at 44-45. That the Gray Scenes are "inseparable or interdependent parts" of a single work, *Casa Duse*, 791 F.3d at 257 (citations omitted), is apparent from the scenes themselves, none of which has any meaning without the context of the overarching screenplay. *See, e.g.*, Dkt. No. 84-9 (scene opening with "10 remaining aviators sit[ting] in their seats and ending with a cut to "a winding desert canyon").

Thus, because the Gray Scenes are not independent "works of authorship," Gray cannot own a copyright in them.

## II. THE DISTRICT COURT CORRECTLY DISMISSED GRAY'S JOINT AUTHORSHIP CLAIM

Separate from his "Gray Scenes" infringement theory, Gray also claimed alternatively (and inconsistently) that he is a joint author with Paramount of the final *Maverick* screenplay and film. In other words, Gray alleged that Paramount, while designating itself as the sole author of *Maverick* through work-made-for-hire agreements, simultaneously intended to make Gray—an unknown screenwriter who was hiding his involvement from Paramount—the one and only joint author of that film. Merely to describe that claim is to underscore its implausibility.

Applying this Court's well-established case law, the district court correctly dismissed it.

### A. Gray Did Not Plausibly Plead Mutual Intent To Be Co-Authors

A "joint work" under the Copyright Act is one "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Because of the "potential danger of allowing anyone who makes even a minimal contribution to the writing of a work to be deemed a statutory co-author," this Court employs a "two-pronged test" to establish co-authorship. *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998). A co-authorship plaintiff must allege not only that each putative author made copyrightable contributions to the work, but also that they each "fully intended to be co-authors." *Id.* That is, a plaintiff must plausibly allege "intent of both participants in the venture to regard themselves as joint authors." *Childress v. Taylor*, 945 F.2d 500, 507 (2d Cir. 1991). Rigorous application of the intent prong is "especially important in circumstances … where one person … is indisputably the dominant author of the work and the only issue is whether that person is the sole author." *Id.* at 508. Because joint authorship "entitles the co-authors to equal undivided interests in the work," joint authorship is "reserved for relationships in which all participants fully intend to be joint authors." *Id.* at 508-09.

To determine whether a plaintiff has plausibly pleaded joint intent, this Court conducts "an examination of the factual indicia of ownership and authorship," focusing primarily on: (1) "a contributor's decisionmaking authority over what changes are made and what is included in a work"; (2) "the way in which the parties bill or credit themselves"; and (3) "the parties' agreements with outsiders." *Thomson*, 147 F.3d at 202-04; *see Casa Duse*, 791 F.3d at 260. Here, the district court correctly held that Gray's complaint "fail[ed] to adequately allege any of these factors." SPA-12. Gray's opening brief admits as much, conceding that he "had no control over Paramount's derivative film, its billing and credit, or registrations." Br. at 53 (emphasis omitted).

1. <u>*Decisionmaking authority*</u>

Start with Gray's and Paramount's relative "decisionmaking authority over what changes [were] made and what [was] included in" *Maverick*. *Thomson*, 147 F.3d at 202-03. Gray's complaint conceded that his participation in *Maverick* commenced only after Paramount had conceptualized the film and commissioned several screenplay drafts. Dkt. 1. ¶¶ 22, 25. Likewise, the complaint conceded that, after Gray's purported involvement ceased, Paramount hired two additional writers "to further develop the Screenplay." *Id.* ¶ 26. Gray alleged no role in either of these steps and no involvement in any other aspect of *Maverick*'s production. The entire scope of his supposed role spanned five months, from June

to November 2017. *Id.* ¶¶ 22, 24, 57 & Ex. 2. Gray cannot (and indeed, did not) allege any plausible "decisionmaking authority" over "what changes [were] made and what [was] included" in *Maverick*'s final screenplay or film, when he had no involvement in those steps at all. *Thomson*, 147 F.3d at 202-03.

At most, Gray alleged that he "superintended *his* work" and "exercised decision-making and editorial authority over revisions to other scenes in the [Singer Draft] suggested by Singer and/or Kosinski." Dkt. 1 ¶¶ 31-32. But that allegation only underscores the absence of allegations that Gray had control over everything else. And in any event, an author who "superintend[s]" a work is usually "a person 'who has actually formed the picture by putting the persons in position, and arranging the place where the people are to be,'" that is, "the inventive or master mind" who "creates, or gives effect to the idea." *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000) (citation omitted). It is clear from the complaint, not to mention the ensuing factually developed record, that Paramount was that "master mind"—Paramount made contractual arrangements for "all other creative contributions to the Screenplay and Film" to be made as "works-made-for-hire" for itself. Dkt. 1 ¶ 42.

The Ninth Circuit's decision in *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962 (9th Cir. 2008), is instructive. There, the heirs of the screenwriter who wrote the treatment that later became the film *The Pink Panther*

argued that the screenwriter was also a coauthor of the film. *Id.* at 964, 967. The court rejected that argument. While the treatment writer "may have had control over the Treatment as originally written, he had no control over how the Treatment was incorporated into the Motion Picture." *Id.* at 970. "Any control" that the screenwriter "may have had over the screenplay," the court emphasized, did "not lend support to his claim that he exercised any control over the creation of the *Motion Picture*." *Id.* (emphasis added). So too here—Gray does not allege any control over the creation of *Maverick* as a whole, only his scenes in the Singer Draft.

2. *Billing*

Next, the district court correctly held that "billing and crediting weigh[ed] against a finding of joint authorship." SPA-12. One author's "attribution of the work to herself alone is 'persuasive proof … that she intended this particular piece to represent her own individual authorship' and is '*prima facie* proof that [the] work was not intended to be joint.'" *Thomson*, 147 F.3d at 203 (citation omitted). In *Thomson*, this Court addressed a claim by the credited dramaturg for the musical *Rent* that she was a co-author under copyright law. *Id.* at 197-98. To support that claim, the plaintiff argued that the playwright's "decision to credit her as 'dramaturg' on the final page of *Rent* scripts reflected some co-authorship intent." *Id.* at 203. This Court disagreed. The playwright had unequivocally credited

himself as the author, and crediting the plaintiff as "dramaturg" did not "reflect[] a co-authorship intent." *Id.* at 203-04.

Under *Thomson*, this is an *a fortiori* case. While the *Thomson* plaintiff received at least some credit, Gray was not billed *at all*. Many others were credited on *Maverick*, Dkt. 1 ¶¶ 1, 7, 20, 25-26, 34; Dkt. 27-05 at 1, but he was not. And Paramount's copyright registration for *Maverick* listed Paramount as its sole author, as an employer-for-hire, consistent with Paramount's work-made-for-hire agreements with all contributors. Dkt. 27-01, 27-02. If Paramount intended to be a joint author with Gray, it presumably would have mentioned him somewhere—anywhere—before, during, or after the film's development and production. It did not.

3. *Written agreements with third parties*

Finally, the "parties' agreements with outsiders" confirm Paramount did not intend to be co-authors with Gray. *Thomson*, 147 F.3d at 204. Gray's complaint concedes that Paramount had a work-made-for-hire agreement with *every writer*—including Singer—as well as the film's director. Dkt. 1 ¶¶ 4, 20, 21, 22, 25-27. As the district court rightly observed, the "fact that [Paramount] entered into a work-made-for-hire agreement with every other writer who was formally involved in the Film demonstrates that it did not intend to share authorship with any individual, including Gray." SPA-14. A contrary finding "would suggest that Gray was the

*only* writer [Paramount] sought to make a joint author and owner." *Id.* Such an allegation is "implausible on its face." *Id.* "It would be illogical," to say the least, to conclude that Paramount, "while not wanting to permit" Singer or Kosinski or anyone else "to own the copyright, intended to share ownership with" Gray, "who at the time had made known no claim to the role of co-author." *Aalmuhammed*, 202 F.3d at 1235; *see Thomson*, 147 F.3d at 204; *Casa Duse*, 791 F.3d at 261.

### B. Gray's Contrary Arguments Are Meritless

Given that he loses on every *Thomson* factor, Gray's opening brief hardly grapples with the law on which the district court relied. Gray instead offers four arguments to challenge the district court's ruling, each of which fails.

*First*, Gray contends that joint authorship "is a question of creation, and it runs between the people who created the work"—"Gray and Singer"—rather than Gray and Paramount. Br. 54. "Paramount did not write the screenplay," he maintains. Br. 55. Rather, it just acquired Singer's rights "under a loan-out agreement" and "holds only what Singer would hold." *Id.* at 55-56. Gray therefore focuses only on his allegations regarding Singer and Kosinski's supposed intent, stressing that they allegedly "invited" him to write and that he "worked for months" with them to prepare the Singer Draft. Br. 53.

This argument misunderstands not only the law but Gray's own complaint. Gray's complaint did not claim to be joint authors with Singer or Kosinski; it

alleged that he was "a joint author of the [Final] Screenplay and Film," and that Paramount "is the other statutory joint author." Dkt. 1 ¶¶ 41-43; *id* ¶ 44. It is therefore *Paramount's* intent as to mutual authorship that matters, and on that score, Paramount's intent could not be clearer—it entered into agreements with *every* known collaborator on *Maverick* precisely to ensure that it alone would be the statutory author of the final screenplay and film. Nor does Gray's attempt to distinguish between authorship and ownership make any sense in this context. *See* Br. 54-55. The Copyright Act provides that "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared [i.e., Paramount] *is considered the author* for purposes of this title." 17 U.S.C. § 201(b) (emphasis added).[9]

*Second*, Gray maintains that the question of joint authorship was inappropriate for resolution on a motion to dismiss, and accuses the district court of drawing inferences in Paramount's favor. Br. at 52-53. But he does not identify what inferences the district court purportedly drew against him. And while it may

[9] In the district court, Gray argued that Paramount intended to create a joint work because Singer and Kosinski supposedly "represented themselves as having the authority and the approval of" Paramount to involve Gray. Dkt. 24 at 13. Gray now eschews this argument, stating that agency does not bear on the joint authorship analysis. Br. 55-56. Paramount agrees. And regardless, as explained at length above, Kosinski and Singer had no authority to make Gray a co-author when they themselves were not authors under their contracts with Paramount. *See supra* at 29-37.

often be that authorship is resolved at summary judgment or trial, that is only because most plaintiffs do not plead themselves out of court. In any event, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). According to his complaint, Gray popped onto the scene after Paramount had already employed other writers to develop a screenplay, worked on an interim draft for five months while keeping his involvement a secret from Paramount, and then disappeared for nearly five years while that draft was further revised and turned into a feature film, on which he received no billing. And the complaint's allegations show that Paramount carefully contracted to ensure that it was the sole author of *Maverick* in every dealing with collaborators it hired to make the film. *See supra* at 5-6, 53-54. Under these circumstances, Gray's claim that Paramount intended him—and only him—to be its co-author despite not knowing of his existence is simply not plausible.

*Third*, in a footnote, Gray argues that the "*Childress/Thomson* test" was "developed to deal with marginal contributors" rather than "obvious co-authorship scenarios" and urges the Court to "consider *en banc* review" of the application of that test. Br. 54 n.13; *see id.* at 51-52. Arguments, like this one, raised "only in a cursory … footnote" are waived. *Radwan v. Manuel*, 55 F.4th 101, 123 n.13 (2d

Cir. 2022). But Gray is also wrong. This Court regarded neither the dramaturg in *Thomson*, who "worked extremely intensively" with *Rent*'s playwright on the script, 147 F.3d at 197, nor the film director in *Casa Duse*, as merely "marginal contributors," *see Casa Duse*, 791 F.3d at 258-59 (noting that a film's director "is certainly potentially one of its most important authors" (citation omitted)); *Thomson*, 147 F.3d at 201. But it applied the *Childress/Thomson* factors anyway. This case falls squarely within *Childress*, *Thomson*, and *Casa Duse*, and Gray's citation of a single out-of-circuit district court opinion does not warrant *en banc* review.

*Finally*, Gray contends that the district court erred by dismissing his joint authorship claim with prejudice. Br. 57-58. But Gray never sought leave to amend that claim. *See, e.g.*, Dkt. 24 at 17 n.6 (conditionally requesting leave to amend only to add unjust enrichment claim). This Court reviews a district court's denial of leave to amend for abuse of discretion, and it has "described the contention that 'the District Court abused its discretion in not permitting an amendment that was never requested' as 'frivolous.'" *Williams v. Citigroup Inc.*, 659 F.3d 208, 212 (2d Cir. 2011) (quoting *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (per curiam)) (finding no abuse of discretion where district court did not grant leave to replead sua sponte). Besides, Gray has never offered any *new* factual allegations that could save his joint authorship claim. He proffers only that

"Singer and Kosinski invited Gray to cowrite the screenplay, held extensive story meetings with Gray, read and praised his scenes, and incorporated them into the screenplay." Br. 57 (emphasis omitted). But his complaint said the same things. *See* Dkt. 1 ¶¶ 22, 24, 30-31. Denial of leave to amend is proper where amendment would be futile, and where, as here, an appellant neither "indicated to the district court how further amendment would permit him to cure" the complaint's deficiencies, nor explains to this Court what he "might add to [his] complaint in order to make it viable," this Court declines to grant such relief. *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 140 (2d Cir. 2011) (quoting *Nat'l Union of Hosp. & Health Care Emps. v. Carey*, 557 F.2d 278, 282 (2d Cir. 1977)) (alterations in original). It should do the same here, particularly where discovery in Gray's infringement claim has only confirmed that Paramount had no knowledge of his purported actions, let alone intended to be a co-author with him.

## CONCLUSION

The district court's judgment should be affirmed.

Date: September 22, 2026

Respectfully submitted,

O'MELVENY & MYERS LLP

By: /s/ Molly M. Lens

Molly M. Lens
F. Cody Kahoe
1999 Avenue of the Stars,
8th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
mlens@omm.com
ckahoe@omm.com

Anton Metlitsky
1301 Avenue of the Americas,
Suite 1700
New York, New York 10019
Telephone: (212) 326-2000
ametlitsky@omm.com

*Attorneys for Defendants-Appellees Paramount Global, Paramount Pictures Corporation, and Paramount Streaming Services Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Second Circuit Local Rule 32.1(a)(4)(A). It contains 13,985 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type styles requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: September 22, 2026

/s/ Molly M. Lens
Molly M. Lens